Robin McKennel LOVITT, Petitioner

v.

William Page TRUE, Warden, Sussex
I State Prison, Respondent.

No. 3:03CV1061.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 6, 2004.

Robert Edward Lee, Jr., Virginia Capital Representation, Resource Center, Charlottesville, VA, Steven Engel, Kenneth W. Starr, Thomas D. Yannucci, Sookyoung Shin, John Caviness O'Quinn, Ashley C. Parrish, Kirkland & Ellis, Washington, DC, for Petitioner.

Katherine Pharis Baldwin, Paul Christopher Galanides, Office of the Attorney General, Richmond, VA, for Respondent.

## MEMORANDUM OPINION

HUDSON, District Judge.

On September 20, 1999, Petitioner, Robin McKennel Lovitt ("Lovitt"), was convicted in the Circuit Court for Arlington County of both robbery and capital murder. Following a sentencing hearing on March 1, 2000, and in accordance with the jury verdict, Lovitt was sentenced to death. Thereafter, on both direct appeal and in collateral state proceedings, Lovitt unsuccessfully challenged his death sentence. He now petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] The matter is now before

---

1. Lovitt filed his petition for a writ of habeas corpus following the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, this Court's review of the petition is governed by the deferential standards of 28 U.S.C. § 2254(d), as

the Court on Respondent's motion to dismiss the petition. For the reasons stated below, Respondent's motion shall be granted.

## I. FACTUAL BACKGROUND [2]

[I]n the early morning hours of November 18, 1998, Clayton Dicks was stabbed six times in the chest and back while working during the overnight shift at Champion Billiards Hall (the pool hall) in Arlington County.

A few months before the killing, Lovitt worked as a cook at the pool hall on an evening shift that ended when Dicks arrived to begin the overnight shift. Amy Hudon, the manager at the pool hall, testified that about two months before Dicks was killed, she had trouble opening a cash register drawer near a pool table and asked Lovitt to help her open the drawer. Lovitt opened it by "wedging" a pair of scissors into the drawer's latch. About two months before the killing, Lovitt quit working at the pool hall.

. . . . .

[On November 18, 1998,] Dicks arrived at the pool hall between 1:30 and 2:00 a.m. The other employees present when Dicks arrived had left the pool hall by 3:00 a.m., leaving Dicks as the sole employee on the premises . . . .

About 3:25 a.m., Jose N. Alvarado and Carlos Clavell entered the pool hall and saw two men arguing behind the bar. Alvarado testified that one man was shorter than the other, and that the shorter man repeatedly shoved the taller man, who was wearing an apron. Alvarado stated that he and Clavell watched as the shorter man stabbed the taller man six or seven times with a silver-colored weapon. Alvarado saw blood on the taller man's apron and watched as the taller man fell to the floor behind the bar. Clavell testified that he heard the taller man begging the shorter man to stop attacking him. Both Alvarado and Clavell saw the assailant repeatedly kick the man who had fallen to the floor. Alvarado and Clavell immediately ran from the pool hall to a service station, where Alvarado telephoned the "911" emergency response number and reported what they had seen. Although Alvarado could not identify Lovitt as Dicks' assailant at the preliminary hearing held in this case, Alvarado testified at trial that he was about "80% certain" that Lovitt was the assailant.

When police and emergency medical personnel arrived at the pool hall in response to Alvarado's telephone call, they found Dicks lying on the floor behind the bar in a pool of blood. Dicks was alive but was unable to speak and was taken by helicopter to a nearby hospital. The multiple stab wounds prevented his heart from functioning, and he died while awaiting surgery.

Dicks had been stabbed six times, five times in the chest and once in the back. Four of these wounds were lethal. Dicks also suffered two areas of internal hemorrhage on both sides of his head, as well as external abrasions on both shoulders and on his left knee.

The police recovered from the pool hall a cash register that was lying on the floor near where Dicks was found. The

---

amended by the AEDPA. *See Green v. French,* 143 F.3d 865, 868 (4th Cir.1998), *cert. denied,* 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999).

**2.** The facts relevant to this motion to dismiss are drawn from the Supreme Court of Virgi-

nia's decisions as found and recited in *Lovitt v. Commonwealth ("Lovitt I"),* 260 Va. 497, 537 S.E.2d 866 (2000), *cert. denied,* 534 U.S. 815, 122 S.Ct. 41, 151 L.Ed.2d 14 (2001); and *Lovitt v. Warden ("Lovitt II"),* 266 Va. 216, 585 S.E.2d 801 (2003).

register was broken into pieces, the cash drawer had been removed from the register and was missing, and a torn piece of a ten-dollar bill was found nearby. A pair of scissors with orange handles that was usually kept in a container on the bar was missing. A police canine unit found an orange-handled pair of scissors bearing blood lying open in the woods about 15 yards behind the pool hall. Warren A. Grant, Lovitt's cousin, testified that Lovitt arrived at Grant's home in the early morning hours of November 18, 1998. Grant lived about a quarter of a mile from the pool hall in a residential area located on the "other side" of the woods. Grant stated that Lovitt knocked on his door sometime between 1:30 and 3:00 a.m. Lovitt ... entered the house carrying what looked like a large, square, gray metal box. After Lovitt unsuccessfully tried to opened the locked box, Grant eventually opened it by using a screwdriver to "pop" some of the screws securing the box. Lovitt removed money from the opened cash register drawer and divided the cash between himself and Grant. Lovitt left the cash register drawer with Grant and instructed him to "get rid of [it]." A few days later, Grant began cutting the cash drawer into pieces with tin snips and put them in a bag.

On November 20, 1989, Arlington Detective Noel E. Hanrahan obtained pieces of the cash register drawer from Grant. Four days later, Lovitt was arrested and charged with the present offenses .... When Officer Stephen Ferrone collected Lovitt's clothing at the jail, Ferrone asked a detective whether he needed to seize Lovitt's jacket. Ferrone testified that, upon hearing this question, Lovitt stated, "I wasn't wearing it when it happened."

Julian J. Mason, Jr., a forensic scientist employed by the Virginia Division of Forensic Science, qualified as an expert witness on the subject of tool mark identification. He testified that the cash register drawer Grant surrendered to the police had been removed from the broken cash register found on the floor of the pool hall. Mason also stated that the pry marks on the cash register drawer were made by the scissors that were found in the woods behind the pool hall.

. . . . .

Carol Palmer, a forensic scientist employed by the Virginia Department of Forensic Science, qualified as an expert witness on DNA testing. Palmer extracted human DNA from two places on the scissors, on a blade near the tip and on a blade near the finger loops. She also extracted blood from three small circular areas on the left front side of Lovitt's jacket, but the DNA tests were inconclusive and Palmer was unable to determine whether the blood on the jacket was human....

.... The DNA extracted from the tip of the scissors displayed a DNA profile that matched the DNA profile of Dicks. The profile derived from this sample did not match the DNA profiles of either Lovitt or Grant, thus eliminating both as contributors of this DNA. Palmer stated that the chance of someone other than Dicks contributing the DNA sample on the tip of the scissors was 1 in more than 5.5 billion.

The DNA extracted from the mid-section of the scissors also matched the DNA profile of Dicks. However, Palmer stated that this DNA evidence, unlike the DNA evidence from the tip of the scissors, did not exclude either Lovitt or Grant and, thus, was inconclusive as to them.

After Lovitt's arrest, he was incarcerated in the Arlington County Jail in the same unit as Casel Lucas. Lovitt and

Lucas developed a friendship during the two months that they lived together in this unit. Lovitt first told Lucas that after leaving the bathroom at the pool hall on the night of the murder, Lovitt saw a Hispanic man stabbing Dicks. Lovitt told Lucas that, at that time, Lovitt saw the cash register drawer, grabbed it, and ran from the pool hall. According to Lucas, Lovitt later stated that he knew Dicks and was aware that no one else would be in the pool hall late at night. Lovitt further related that he waited in the bathroom until everyone left the pool hall before coming out of the bathroom to attempt to open the cash register drawer. Dicks confronted Lovitt as he unsuccessfully attempted to open the cash drawer. Lovitt told Lucas that he had to kill Dicks because Dicks had recognized him. According to Lovitt, Dicks asked him, "Why [are] you doing this?" Lovitt admitted to Lucas that he stabbed Dicks several times and took the cash register drawer to his cousin's house where he and his cousin split the money before leaving to buy some drugs. Lovitt told Lucas that he discarded the murder weapon while en route to or from Grant's house, and that he changed his clothes at Grant's house because he had blood on his shirt and pants.

. . . . .

During the penalty phase of the trial, the Commonwealth presented evidence of Lovitt's criminal record. In October 1975, when Lovitt was 11 years old, he was charged with assault and placed in protective supervision. Also as a juvenile, in August 1979, Lovitt was committed to Beaumont Learning Center of the State Department of Corrections (Beaumont) based on adjudication of charges of breaking and entering and larceny. While at Beaumont, Lovitt was disciplined for fighting, assault, and possessing contraband items. After his release from Beaumont in 1980, Lovitt was convicted of grand larceny in 1981 and was sentenced to 12 months in jail.

Between 1983 and 1985, Lovitt was convicted of petit larceny, grand larceny, breaking and entering, and distribution of marijuana. In 1986, Lovitt was convicted of attempted robbery and was sentenced to a term of imprisonment of from one to three years. After being released on parole in August 1987, Lovitt's parole was revoked in August 1988 based, in part, on additional arrests and his failure to pass certain drug tests. Lovitt later was convicted of statutory burglary and grand larceny. While incarcerated on these convictions and the parole violation, Lovitt was disciplined for damaging property and for fighting. In September 1990, Lovitt again was released on parole. In early 1991, Lovitt was convicted of possession of cocaine, grand larceny, and burglary. While incarcerated on these charges, Lovitt was the subject of ten disciplinary actions for offenses including possession of contraband, disobeying direct orders, assault, possession of intoxicants, and manufacturing "shank handles." After being released on parole in October 1996, Lovitt was convicted in 1997 of possession of marijuana, petit larceny, unlawful entry, assault and battery, and destruction of property. Lovitt was on parole at the time of the present offenses.

In October 1998, Arlington County Police Officer Jerome A. Lee detained Lovitt in an apartment parking lot in Arlington. Lovitt had parked his car behind the apartments, appeared to be very nervous, and consented to a search of his vehicle. Lee found a long kitchen knife on the floor of the passenger area and a soda can used to smoke crack cocaine in the rear floor area of the vehicle.

Lovitt presented testimony from his sister, [Lamanda] Jones, who testified that Lovitt was the oldest of 12 children and that he helped take care of his younger siblings, although not "gladly." Lovitt also presented testimony from four deputies employed by the Arlington County Sheriff's Office, who stated that Lovitt had not presented any disciplinary problems while being held in jail on the present charges.

*Lovitt I*, 260 Va. at 502–08, 537 S.E.2d at 870–73.

In May of 2001, about six months after the Supreme Court of Virginia affirmed Lovitt's convictions, the Circuit Court for Arlington County entered an order authorizing the destruction of the exhibits entered into evidence at Lovitt's trial. *Lovitt II*, 266 Va. at 229, 585 S.E.2d at 808. Pursuant to that order, all of the exhibits received in evidence at trial, with the exception of one chart, were destroyed. *Id.*

## II. PROCEDURAL BACKGROUND AND HABEAS STANDARD

During the sentencing phase of trial, after the jury concluded that Petitioner poses a future danger to society and that the murder he committed was outrageously and wantonly vile, they fixed Lovitt's punishment for capital murder at death. As punishment for the robbery, the jury sentenced him to life imprisonment. Lovitt appealed to the Supreme Court of Virginia, which affirmed the circuit court's judgment. *See Lovitt I*, 260 Va. at 520, 537 S.E.2d at 881. On October 1, 2001, the United States Supreme Court denied Lovitt's petition for a writ of certiorari from the state court's final judgment. *Lovitt v. Virginia*, 534 U.S. 815, 122 S.Ct. 41, 151 L.Ed.2d 14 (2001).

Thereafter, Lovitt filed a state petition for a writ of habeas corpus alleging, among other things, that the Supreme Court of Virginia, by ratifying the Commonwealth's

destruction of trial exhibits, prevented him from obtaining an adequate habeas review and, in so doing, violated his right to due process. Second, he alleged that the prosecution willfully and unlawfully suppressed exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). And finally, he argued that, at trial, he was denied the effective assistance of counsel. After reviewing Lovitt's petition, the Supreme Court of Virginia concluded that it raised disputed issues of fact that could not be resolved without a full evidentiary hearing. Thus, the Supreme Court directed the Circuit Court of Arlington County ("the circuit court") to conduct an evidentiary hearing regarding each of Lovitt's disputed factual claims, pursuant to Virginia Code Section 8.01–654(C).

Prior to the hearing, the circuit court granted Lovitt leave to take extensive discovery, including the depositions of the two Assistant Commonwealth's Attorneys who prosecuted his case and that of a deputy circuit court clerk. Additionally, Lovitt was granted leave to subpoena the social services records of many of his family members from a variety of government agencies. Likewise, he requested and was granted copies of relevant records from the prosecutors' files.

After the discovery period expired, the circuit court conducted a comprehensive, two-day evidentiary hearing ("the habeas hearing" or "the evidentiary hearing"). At the conclusion of that hearing, the circuit court wrote a report describing the court's extensive findings of fact and its recommended conclusions of law. Upon receipt of those findings and recommendations, the Supreme Court of Virginia ordered the parties to fully brief, and then orally argue, the disputed issues. Although the Supreme Court of Virginia was bound by all of the circuit court's factual findings

that were not either plainly wrong or without evidentiary support, *see Hedrick v. Warden,* 264 Va. 486, 496, 570 S.E.2d 840 (2002), it reviewed each issue of mixed law and fact *de novo. See Lovitt II,* 266 Va. at 229, 585 S.E.2d at 808.

Following the dismissal of Lovitt's second state application for post-conviction relief, Lovitt filed a federal writ of habeas corpus with this Court under Title 28 of the United States Code, Section 2254 (" § 2254"), which has been amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996. Under § 2254(d)(1), this Court may issue a writ of habeas corpus only if Lovitt's state habeas proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.[3] *See Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

The Supreme Court has interpreted an "unreasonable application" of law to mean a state court's application of established federal law, as determined by the Supreme Court, in an objectively unreasonable way. *Bell,* 535 U.S. at 694, 122 S.Ct. 1843. This is not to say that a federal court can grant habeas relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Rather, under the "unreasonable application" clause, this Court may grant relief only if the state court correctly identified the governing legal principle but

unreasonably applied it to the facts of Lovitt's case. *Id.* at 407–08, 120 S.Ct. 1495.

## III. PETITIONER'S GROUNDS FOR FEDERAL HABEAS CORPUS RELIEF

In support of his petition for a writ of habeas corpus, Lovitt makes a number of claims. First, he argues that the Supreme Court of Virginia unreasonably determined the relevant facts and unreasonably applied *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. 1194, to his claims that the government unlawfully suppressed certain exculpatory evidence that was material to his defense. Second, Lovitt contends that the state court unreasonably erred by failing to consider the misconduct of the Assistant Commonwealth's Attorneys, each of whom made "intentional misrepresentations" to the jury. Third, he maintains that the Supreme Court of Virginia unreasonably applied *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), to the facts of his case by finding that the Commonwealth's post-conviction destruction of certain evidence was neither done in bad faith nor material to the defense. Fourth and finally, Lovitt argues that the state court unreasonably applied *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), by holding that his attorneys were not ineffective during the penalty phase of trial. In the substantive portion of the opinion that fol-

**3.** The Supreme Court has determined that the "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue a writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth by the Supreme Court, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. The court may grant relief under the "unrea-

sonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies it to the fact of a particular case. *See Bell,* 535 U.S. at 694, 122 S.Ct. 1843. In Lovitt's petition, he only argues that the state court unreasonably applied federal law to the facts of his case; thus, the Court will conduct its analysis under the "unreasonable application" clause only.

lows, the Court will review each of these allegations in turn.

## IV. EXHAUSTION AND PROCEDURAL BAR

■ As the respondent concedes, each of Lovitt's pending habeas claims has been "exhausted" within the meaning of Title 28 of the United States Code, Section 2254(b), either because it was presented to the Supreme Court of Virginia on direct appeal or habeas review or because it was never presented to the Supreme Court and now cannot be presented to that court under Virginia Code Section 8.01–654(B)(2), which generally prohibits successive habeas petitions.

■ Any habeas claim that, even though "exhausted" under § 2254(b), has also been procedurally defaulted may not be reviewed on its merits. *See Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). In this case, the Supreme Court of Virginia found that one of Lovitt's claims, that relating to the prosecutors' alleged misconduct, was defaulted under Virginia Code Section 8.01–654(B)(2). *Lovitt II,* 266 Va. at 244 n. 4, 585 S.E.2d at 817 n. 4. Although Lovitt contests the Supreme Court's finding of procedural default, he also alleges that sufficient cause and prejudice exist so as to excuse any potential default of such a claim. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Court will take up the default issue in due course. *See* Part XIII, *infra.*

## V. SUBSTANTIVE AND PROCEDURAL STANDARDS GOVERNING FEDERAL HABEAS CORPUS RELIEF

In its determination of whether habeas relief is warranted, this Court is governed by 28 U.S.C. §§ 2254(d) and (e). Under Section 2254(e), "a determination of a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

*See* 28 U.S.C. § 2254(d). The Supreme Court has emphasized that this standard places an additional hurdle before federal habeas petitioners who must demonstrate not only that the state court's decision was erroneous or incorrect but also that it was unreasonable. *See Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495.

## VI. LOVITT'S AFFIDAVIT

As a preliminary matter, along with his petition for habeas corpus relief, Petitioner also filed a six-page affidavit, which he executed on March 5, 2004. Lovitt's affidavit offers testimony regarding (1) the Commonwealth's witness Casel Lucas; (2) the failure of trial counsel to adequately investigate Lovitt's background; and (3) how the Arlington Circuit Court deputy clerk's destruction of evidence has precluded him from seeking additional DNA testing.

■ After a thorough review of both Lovitt's affidavit and the complete state court record, this Court is of the opinion that although Lovitt had ample opportunity to develop the factual information contained in his affidavit during the state

habeas proceedings, he chose not to do so. Consequently, under § 2254(e)(2), this Court is barred from considering such evidence.

## VII. PETITIONER'S BRADY CLAIMS

In *Brady v. Maryland*, the Supreme Court held that a criminal defendant's due process rights are violated when the prosecution suppresses evidence that is material to either guilt or punishment, irrespective of the good or bad faith of the prosecution. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Evidence is "material" under *Brady* "only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different." *Goins v. Angelone*, 52 F.Supp.2d 638, 674 (E.D.Va.1999) (quoting *Wood v. Bartholomew*, 516 U.S. 1, 5, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995)). In his petition, Lovitt contends that the Supreme Court of Virginia unreasonably denied relief on his claims that the Commonwealth violated *Brady* by (1) failing to disclose Dr. Pierre–Louis's opinion regarding the alleged murder weapon; (2) failing to disclose Casel Lucas's lengthy history as an informant; and (3) by failing to explore how the cumulative impact of these failures prejudiced Lovitt's defense and undermined confidence in the verdict.

### A. The Commonwealth's Suppression of Dr. Pierre–Louis's Scissors Opinion

Lovitt first claims that the Supreme Court of Virginia unreasonably applied *Brady* when it determined that the Commonwealth was not required to disclose the pre-trial opinion of the medical examiner, Dr. Pierre–Louis, *vis-a-vis* the two pairs of scissors she examined at autopsy.[4] With respect to this issue, the state court reviewed the record and made the following factual findings:

> Dr. Marie–Lydie Y. Pierre–Louis was the medical examiner who performed the autopsy on Clayton Dicks. Among those present during the autopsy were Assistant Commonwealth's Attorney Margaret E. Lair–Eastman (Eastman), one of the prosecuting attorneys at Lovitt's trial, and Detective Stuart Chase of the Arlington County Police Department.

> During the autopsy, Dr. Pierre–Louis was shown two pairs of scissors recovered from a container next to the cash register near the location where Dicks' body was found. Dr. Pierre–Louis was not shown the orange-handled pair of scissors found with blood on the blade tip (the bloody scissors), discovered in the woods behind the pool hall and admitted into evidence at Lovitt's trial.

> The autopsy report prepared by Dr. Pierre–Louis indicated that each of Dicks' six stab wounds displayed a blunt and a sharp edge. The wounds ranged in depth between three and eight inches, and three of these wounds were between six and eight inches deep.

> The autopsy report further indicated that one of the pairs of scissors exam-

---

4. At trial, it was the Commonwealth's theory that a particular pair of "bloody scissors"— those found near the pathway leading to Lovitt's cousin's house and containing DNA attributed to the victim—were in fact the murder weapon. In his petition, Lovitt maintains that Dr. Pierre–Louis's initial opinion, noting that the scissors she observed at autopsy, which were similar in size and dimension to the bloody scissors, could not have been the murder weapon, was exculpatory because it diminished the Commonwealth's theory that the bloody scissors were the murder weapon. Lovitt believes that, despite the overwhelming facts to the contrary, Dr. Pierre–Louis's initial opinion would have permitted a reasonable trier of fact to infer that another, as yet unrecovered, weapon actually caused the decedent's wounds.

ined by Dr. Pierre–Louis had a total length of eight-and-one-half inches with blades that were three-and-one-half inches long and one-half inch wide at the base. The other pair of scissors she examined was six-and-one-half inches in length and had blades that were three inches long and one-half inch wide at the base.

At the autopsy, Dr. Pierre–Louis told Eastman and Detective Chase that neither of the two pairs of scissors that she examined could have been the murder weapon because the length and width of their blades were not consistent with the nature and dimensions of Dicks' stab wounds. Dr. Pierre–Louis also told Eastman and Chase that she would have to examine the bloody scissors before she could reach a conclusion whether those scissors were the source of Dicks' wounds.

Dr. Pierre–Louis' opinion concerning the two pairs of scissors she examined was not included in the autopsy report. Neither Eastman nor anyone else in the prosecutor's office informed Lovitt's trial counsel of Dr. Pierre–Louis' opinion. During Lovitt's trial, Dr. Pierre–Louis was not asked to give her opinion concerning the two pairs of scissors that she had examined, nor was she asked to opine whether the bloody scissors admitted into evidence were consistent with Dicks' stab wounds.

*Lovitt II,* 266 Va. at 231–32, 585 S.E.2d at 810.

Lovitt assigns error to a number of the state court's factual and legal conclusions because each, he argues, was based on an unreasonable application of *Brady.* First, according to Lovitt, the Supreme Court of Virginia unreasonably determined that the scissors Dr. Pierre–Louis examined at autopsy were different in size from the "bloody scissors" the Commonwealth alleged to be the murder weapon. Second, the court unreasonably found that the doctor's initial opinion was not exculpatory. And third, the Supreme Court of Virginia unreasonably held that Dr. Pierre–Louis's initial opinion was not material.[5]

■■ A *Brady* violation has three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, i.e., it must have prejudiced the defense at trial. *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Monroe v. Angelone,* 323 F.3d 286, 299–300 (4th Cir.2003). Under the second prong of *Brady,* it is clear that the government suppressed Dr. Pierre–Louis's initial scissors opinion. The real question, under the first prong, is whether that opinion, in and of itself, would have been exculpatory to the defendant. *See Kyles,* 514 U.S. at 436–37, 115 S.Ct. 1555.

#### 1. Dr. Pierre–Louis's Initial Opinion

Lovitt first takes issue with the Supreme Court of Virginia's finding that the medical examiner's initial opinion was not exculpatory because the scissors she analyzed were "not introduced into evidence, were not the alleged murder weapon, and were not shown to be the same size as the alleged murder weapon." *Lovitt II,* 266 Va. at 245, 585 S.E.2d at 818. Instead, Lovitt argues that because one of the pairs of scissors presented to Dr. Pierre–Louis

---

**5.** The most important aspect of materiality is its "definition in terms of suppressed evidence considered collectively, not item by item." *Kyles v. Whitley,* 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Consequently, the Court will analyze Petitioner's *Brady* concerns as they relate to the materiality of the doctor's scissors opinion in the cumulative impact discussion, *infra,* at Part VII–C.

at autopsy "had blades that were identical in size—3½ inches long and 1/2–inch wide—to the 'missing,' bloody scissors found behind the pool hall and later introduced at trial as the alleged murder weapon," her opinion was exculpatory and should have been disclosed. *See* Pet. at 6–7.

At the post-conviction evidentiary hearing, a circuit court judge reviewing evidence on this topic heard testimony from three sources: Dr. Pierre–Louis, Detective Chase, and Deputy Commonwealth's Attorney Barbara Walker. Reevaluating that evidence, the Supreme Court of Virginia concluded that the medical examiner's statements were not exculpatory:

> We first consider Dr. Pierre–Louis' comment made at the autopsy that the two pairs of scissors she was shown were not consistent with Dicks' wounds. As stated above, both Detective Chase and Barbara Walker testified that these scissors were not the same size as the bloody scissors, which were the scissors introduced at trial. In addition, after the bloody scissors were subjected to DNA testing, which showed that Dicks' blood was on the tip of the scissors, Dr. Pierre–Louis told Detective Chase that she had been wrong in her earlier conclusion regarding the pairs of scissors she examined.
>
> We conclude that Dr. Pierre–Louis' opinion concerning the scissors presented at the autopsy was not exculpatory evidence because that opinion related to scissors that were not introduced into evidence, were not the alleged murder

weapon, and were not shown to be the same size as the alleged murder weapon. Her initial opinion also was not exculpatory in light of the circuit court's factual finding, supported by the testimony of Detective Chase, that Dr. Pierre–Louis changed her opinion before trial. Therefore, we hold that the prosecution was not required to provide the defense information concerning Dr. Pierre–Louis' initial opinion stated at the autopsy.

*Lovitt II*, 266 Va. at 245, 585 S.E.2d at 818.

Although Lovitt questions that finding, arguing that Dr. Pierre–Louis's initial opinion would have undermined the Commonwealth's theory of the case, he fails to explain how the Commonwealth's disclosure of Dr. Pierre–Louis's opinion would have been favorable to his defense. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194. On the contrary, regardless of the size and dimensions of the scissors presented to Dr. Pierre–Louis during the autopsy, it is clear from the record that neither was the pair of "bloody scissors" the police retrieved from the killer's alleged escape route. In addition, Dr. Pierre–Louis gave no opinion, either during the autopsy or at trial, regarding likelihood that the "bloody scissors" were the murder weapon. Consequently, even had her initial opinion been revealed to the defense, it would only have served to rule out the two pairs of pool hall scissors, both of which were unrelated to the alleged murder weapon.[6]

The Court's analysis of this issue is unhampered by Lovitt's attempt to cull the

---

**6.** At the post-conviction evidentiary hearing, Dr. Pierre–Louis was presented with and reviewed a *photograph* of a pair of bloody scissors partially covered by debris. *Lovitt II*, 266 Va. at 233, 585 S.E.2d at 810–11. She did not, however, review the actual scissors that were offered into evidence at trial nor was she ever able to compare the dimensions of both blades of the bloody scissors to those

of the pool hall scissors. *Id.* Although she opined, during the evidentiary hearing, that the bloody scissors could not have caused all of the victim's fatal wounds, she also conceded that the blade she could accurately measure, from the photograph, could have caused three of the victim's stab wounds. *Id.* The other blade, she could not measure due to its positioning in the photograph. *Id.*

record for discrepancies between the trial evidence and the post-conviction hearing testimony, the totality of which he believes demonstrates a due process violation. First and foremost, it bears emphasis that, prior to trial, Lovitt obtained a copy of the autopsy report, access to all of the physical evidence in the case including the bloody scissors, and the advice of an expert from the Northern Virginia Forensic Laboratory. *Lovitt II*, 266 Va. at 234–35, 585 S.E.2d at 811. Second, according to Lovitt's own expert, a pair of scissors of the same approximate size and dimension as the "bloody" scissors could have caused the wounds suffered by Dicks. *Id.* And finally, although two separate state courts heard disputed testimony regarding the various sizes and dimensions of the scissors, each independently concluded that the scissors Dr. Pierre–Louis observed at autopsy were different in size and shape from the scissors used to murder the decedent.

██ Moreover, as both the circuit court and the Supreme Court of Virginia found, prior to trial, Lovitt's attorney, Denman Rucker, had access to Dr. Pierre–Louis and could have asked her to compare the victim's wounds to the various pairs of scissors. *Lovitt II*, 266 Va. at 234, 585 S.E.2d at 811. "Where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir.1990).

Consequently, this Court must agree with the Supreme Court of Virginia. "Lovitt cannot show he was prejudiced by the Commonwealth's failure to inform him of Dr. Pierre–Louis'[s] initial opinion, because he was aware of the issues involving scissors of that approximate size and investigated those issues as part of his defense ...." *Lovitt II*, 266 Va. at 246, 585

S.E.2d at 818. Moreover, it is this Court's opinion that, under *Brady* and its progeny, the Supreme Court of Virginia reasonably concluded that even had the Commonwealth disclosed the doctor's scissors opinion to the defense, it is unlikely that such evidence would have affected the outcome of the trial. Thus, the doctor's comments were not exculpatory, and the Commonwealth did not violate Lovitt's due process rights by failing to disclose them.

### 2. The Doctor's Pre–Trial "Recantation" of Her Initial Opinion

Next, the Court must address whether the Supreme Court of Virginia reasonably determined that Dr. Pierre–Louis's opinion was not exculpatory because she either amended or abandoned it prior to trial. Specifically, this issue involves circumstances under which, during a post-autopsy telephone conversation with Detective Chase, the doctor learned that police had recovered a third pair of scissors, the "bloody scissors," which they believed to be the murder weapon. Responding to this information, Dr. Pierre–Louis "made some comment that, I guess I was wrong, or, I made a mistake." *Lovitt II*, 266 Va. at 234, 585 S.E.2d at 811. Some time later, also hearing that the newly discovered scissors contained the victim's blood, the doctor responded by saying "oh well," which the prosecutors took to mean that she had abandoned "any notion that scissors could not be the murder weapon." *Id.*

Reviewing the post-conviction hearing record, the Supreme Court of Virginia held that Dr. Pierre–Louis's initial opinion "was not exculpatory in light of the circuit court's factual finding, supported by the testimony of Detective Chase, that Dr. Pierre–Louis changed her opinion before trial." *Lovitt II*, 266 Va. at 245, 585 S.E.2d at 818. To this conclusion, Lovitt

advances two assignments of error. First, he argues that the state court failed to apply the test of presumptive materiality required by *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).[7] Second, he contends that, even without the *Agurs* presumption, it was unreasonable for the Supreme Court of Virginia to conclude from Dr. Pierre–Louis's remarks that she had changed her opinion. Thus, it was unreasonable for that court to find, under *Brady*, that such an "alteration" rendered the doctor's opinion any less favorable to the defense. Of course, this Court reviews such decisions only to determine whether the state court reasonably applied the apposite federal law.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment ...." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Addressing Lovitt's second assignment of error first, it is the opinion of this Court that although both the circuit court and the Supreme Court of Virginia improperly concluded that the doctor changed her initial opinion prior to trial, the state court reasonably applied *Brady* in determining that the doctor's opinion itself, in whatever form, was not exculpatory to the defense.

Here, Petitioner first argues that, as a factual matter, it was unreasonable for the Supreme Court of Virginia to conclude that Dr. Pierre–Louis's comments to Detective Chase were intended to retract her initial opinion. To that end, Lovitt contends that, during the doctor's brief conversation with the detective, Dr. Pierre Louis only learned that police had found "what [they] believe[d] to be the murder weapon" near the crime scene. Pet. at 10.

She was not given the dimensions of the bloody scissors, nor did she ask about them. Moreover, as the Supreme Court of Virginia found, "Dr. Pierre–Louis also told Eastman and Chase that she would have to examine the bloody scissors before she could reach a conclusion whether those scissors were the source of [the victim's] wounds." *Lovitt II*, 266 Va. at 232, 585 S.E.2d at 810. Considering her lack of information about the third pair of scissors, Lovitt argues, it would be illogical to dub her remarks a "retraction" of her initial opinion.

It is not for this Court to second-guess the state court's factual determinations. Rather, this Court is to review whether those factual determinations were reasonable under the strictures of federal law. *See Williams*, 529 U.S. at 403–404, 120 S.Ct. 1495 ("Congress intended federal judges to attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before concluding that those proceedings were infected by constitutional error sufficiently serious to warrant the issuance of the writ."). *See also Bell*, 535 U.S. at 694, 122 S.Ct. 1843. On the other hand, if the circuit court's factual finding is plainly wrong or without evidence to support it, the reviewing court need not accept it. *See Hedrick*, 264 Va. at 496, 570 S.E.2d 840.

It is this Court's opinion that, in performing its *Brady* analysis on the "retraction" issue, the Supreme Court of Virginia erred in accepting the circuit court's factual conclusion. Considering the scope and brevity of the discussion between the doctor and Detective Chase, it makes little sense that, having heard only that police had uncovered a third, blood-covered pair

---

**7.** Again, pursuant to current *Brady* jurisprudence, this Court assesses the materiality claims Petitioner raises in terms of the potential, cumulative effect of all of the suppressed evidence on Lovitt's case, *infra*, at Part VII–C. *See Kyles*, 514 U.S. at 436–47, 115 S.Ct. 1555.

of scissors, Dr. Pierre–Louis would decide that her previous opinion—which *eliminated* two unrelated pairs of scissors as potential murder weapons—was incorrect. Nowhere in the record had the doctor opined that the murder weapon could not have been a pair of scissors. Rather, she noted that neither of the two pairs she examined, each of which had different blade lengths and widths, could have killed the victim.

Even more telling, the Supreme Court of Virginia determined that Dr. Pierre–Louis, after learning about the third pair of scissors, told the detective and one prosecutor that "she would have to examine the bloody scissors before she could reach a conclusion" about whether they were, indeed, the murder weapon. *Lovitt II*, 266 Va. at 232, 585 S.E.2d at 810. In the wake of such a remark, the Court finds it unreasonable to believe that the doctor's "oh well" and "I guess I was wrong" comments were anything more than offhand, spur of the moment responses to an otherwise uneventful conversation. The Court finds no evidence that Dr. Pierre–Louis changed or retracted her initial opinion concerning the two pairs of pool hall scissors; thus, the state court erred in so finding.

■ This does not, however, change the Court's analysis with respect to the less-than-exculpatory nature of the doctor's opinion. Whether or not the doctor changed her opinion, the fact remains that even according to Petitioner's own pretrial expert, the bloody scissors were of such a size as to have been capable of causing the victim's death. Nothing in Dr. Pierre–Louis's original scissors opinion affects that conclusion; thus, nothing in that opinion would have been favorable to the defense under *Brady*. Accordingly, it was not unreasonable for the state court to discount the exculpatory value of the doctor's amended opinion. On the contrary, this Court concurs with the state court that Dr. Pierre–Louis's initial opinion was *not exculpatory* "because that opinion related to scissors that were not introduced into evidence, were not the alleged murder weapon, and were not shown to be the same size as the alleged murder weapon." *Lovitt II*, 266 Va. at 245, 585 S.E.2d at 818.

## B. The Commonwealth's Alleged Failure to Disclose the Lengthy Informant History of a Key Prosecution Witness

The second facet of Petitioner's due process challenge involves the testimony of a significant prosecution witness, Casel Lucas ("Lucas"). At trial, Lucas testified that the petitioner, while confined with Lucas at a correctional facility, confessed to first taking the cash register box and then stabbing the decedent in order to avoid being identified. *Lovitt I*, 260 Va. at 505–06, 537 S.E.2d at 872. On several prior occasions, Lucas had served as an informant or witness for the prosecution in unrelated criminal cases. *Id.* Although the Commonwealth supplied defense counsel with a computer printout of Lucas's prior convictions, prosecutors did not disclose his prior history as an informant. *Lovitt II*, 266 Va. at 235, 585 S.E.2d at 811–12.

On habeas, Petitioner contends that the Commonwealth violated his due process rights by failing to disclose Lucas's prior history of both police and prosecutorial cooperation. More specifically, Petitioner asserts that the Supreme Court of Virginia misapplied the holding in *Brady* when it determined that Lucas's record as a jailhouse informant was not material impeachment evidence because such informant history was not favorable to the defense. For its part, the Commonwealth argues that the Supreme Court of Virginia appropriately rejected both arguments on their merits.

The Supreme Court of Virginia based its analysis of Petitioner's due process claim

on the following facts, which are taken from that Court's opinion:

Before Lucas testified at trial, Eastman and Walker [8] provided Lovitt's defense counsel with a report detailing Lucas's extensive criminal record. However, neither Eastman nor Walker disclosed to defense counsel that Lucas had provided information to various police departments in four previous criminal cases. The circuit court found that before the trial, the prosecutors in Lovitt's case were "unaware that Casel Lucas had provided information regarding any other case."

The evidence at the habeas hearing showed that in 1998, Lucas testified in Alexandria against Steven Evans, who had been charged with robbery. In exchange for his testimony, Lucas received a total recommended sentence of 20 years' imprisonment for various pending criminal charges, including robbery, abduction with the intent to defile, and attempted rape.

Walker testified that although Lucas told her about his cooperation with the police in the Evans case, she did not tell either Rucker or Janell Wolfe, Lovitt's co-counsel at trial, about Lucas's role in that prosecution. However, Walker stated that Lucas's sentence in the Evans case was included in his criminal record that the prosecution provided to defense counsel before Lucas testified. When Wolfe interviewed Lucas prior to his testifying, Lucas told her of his involvement in the Evans case. However, Lucas did not inform Wolfe that he had cooperated with the police in any other cases. Wolfe testified that had she received such information, she and Rucker would have used it to impeach Lucas's credibility at trial. At Lovitt's trial, Rucker cross-examined Lucas concern-

ing his cooperation with the police in the Evans case.

In 1996, Lucas provided information to the police concerning a "jailhouse confession" made by Edward Young, who had been charged with rape in Arlington County. Walker served as the prosecutor during the sentencing in the Young case and Wolfe served as Young's counsel. However, neither Walker nor Wolfe was aware of Lucas's involvement in the Young case because the case did not proceed to trial and the defendant's plea agreement did not mention Lucas. Lucas did not receive any benefit in exchange for the information that he provided in the Young case.

In 1997, Lucas provided information to detectives in the District of Columbia concerning the "Starbucks triple homicide" case. One of the detectives sent a letter to the judges of the Circuit Court of the City of Alexandria informing them of Lucas's cooperation in the Starbucks case. There was no evidence that Lucas received any benefit resulting from his cooperation with the police in that case. Further, prior to Lovitt's trial, the Arlington prosecutors did not have any information about Lovitt's cooperation in the Starbucks case.

In 1998, Lucas provided Alexandria authorities with a statement detailing a defendant's "jailhouse confession" in the "Eddie Lee case." Lucas did not receive any benefit as a result of his cooperation in that case, and the Arlington prosecutors were not aware of Lucas's involvement in the Lee case prior to Lovitt's trial.

In June 1999, before Lovitt's trial, Lucas sent a letter to Judge Paul F. Sheridan of the Arlington County Circuit Court requesting reconsideration of one of his

---

**8.** Margaret E. Lain–Eastman and Barbara Walker were the two Assistant Common-wealth's Attorneys who prosecuted Lovitt's case.

sentences. In the letter, Lucas stated that he had cooperated with the police in previous matters but did not mention Lovitt's case. The letter was sent directly to Judge Sheridan's chambers and a copy of the letter apparently was not placed in Lucas's file until after Lovitt's trial. Lucas's request for reconsideration was denied. The prosecutors in Lovitt's case were not aware of Lucas's letter at the time of Lovitt's trial. *Lovitt II*, 266 Va. at 235–36, 585 S.E.2d at 811–12.

With the exception of the Evans case, the Supreme Court of Virginia found that Lucas's record of cooperation with authorities did not constitute impeachment evidence, subject to disclosure, because Lucas had received no benefit for his assistance. *Lovitt II*, 266 Va. at 247, 585 S.E.2d at 819. Furthermore, with respect to the Evans case, the Supreme Court of Virginia concluded that Lucas himself revealed his cooperation to Lovitt's defense counsel, which defense counsel later used, at trial, to cross-examine Lucas. *Id.* Finally, the Supreme Court of Virginia, relying on *Strickler v. Greene*, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), found that Petitioner failed to demonstrate a reasonable probability that, had prosecutors disclosed this evidence to the defense, the proceeding would have resulted in a different outcome. In Petitioner's view, each of these conclusions is the result of an unreasonable determination of fact and an unreasonable application of federal law.

As this Court stated above, *Brady* requires the prosecution to disclose exculpatory evidence if it is both *favorable* and *material* to the defense. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court held that impeachment evidence is clearly within the boundaries of the *Brady* rule. *Giglio*, 405 U.S. at 155, 92 S.Ct. 763. The

Court, in *Giglio*, explained that when the government has entered into an agreement or understanding with a key witness regarding his prosecution, the credibility of that witness is at issue, and any failure to disclose details of the deal may deny the accused due process. *Id.*

In *Strickler*, the Court further elaborated on that proposition by holding that exculpatory evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the proceeding would have resulted in a different outcome. *Strickler*, 527 U.S. at 280, 119 S.Ct. 1936. Again, a "reasonable" probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. In order to establish a *Brady* violation in the context of Lucas's cooperation, Petitioner must demonstrate that: (1) there was evidence of an agreement or an understanding; (2) the prosecution suppressed the evidence; (3) the evidence was favorable either because it was exculpatory or impeaching; and (4) the evidence was material to the defense. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194.

■ Lucas's history of cooperation consisted of four separate occasions. The prosecution, however, had prior knowledge of only one of those occasions. With respect to the one, known incident of Lucas's cooperation—the Evans case—the trial court found that the prosecutors were aware both of Lucas's testimony against Steven Evans in the City of Alexandria and that Lucas had received a reduced sentence in exchange for his testimony. Regardless, the prosecutors failed to disclose Lucas's cooperation to Petitioner's trial counsel. Clearly, such evidence was exculpatory under *Brady*, and the Commonwealth should have disclosed it.

■ Nonetheless, during a pre-trial interview of Lucas, Petitioner's trial counsel

learned about his cooperation and was able to use that information, during trial, to cross-examine Lucas.[9] Accordingly, when applying the final prong of the *Brady* test, the Supreme Court of Virginia, relying on *Strickler* and *Kyles*, found that the prosecution's failure to disclose evidence of Lucas's cooperation in the Evans case "did not place Lovitt's trial in a posture that would undermine confidence in the verdict." *Lovitt II*, 266 Va. at 247, 585 S.E.2d at 819. Consequently, the Supreme Court of Virginia concluded that evidence of Lucas's cooperation was not material to the defense.

■ Given the fact that both of Petitioner's attorneys were aware of Lucas's assistance in the Evans case prior to trial, there is no reasonable probability that, had the prosecution disclosed such information sooner, the result of the proceeding would have been different. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Accordingly, it is the opinion of this Court that, in rejecting Petitioner's argument, the Supreme Court of Virginia reasonably applied federal law as declared by the United States Supreme Court.

■ Lucas's other instances of cooperation stand on a different legal footing. As the trial court concluded, with respect to those three cases, prosecutors were unaware of Lucas's involvement. Furthermore, in those cases Lucas received no legal benefit in exchange for the information he provided to law enforcement officials. To implicate *Brady* and *Giglio,* there must be an explicit promise, or a plea agreement, that the defendant will receive a legal benefit in exchange for his

testimony or cooperation. *Collier v. Davis,* 301 F.3d 843, 848–49 (7th Cir.2002); *Knox v. Johnson,* 224 F.3d 470, 481–82 (5th Cir.2000). Lucas's hopeful expectation that he would receive some type of legal benefit for his cooperation is insufficient to support a *Brady* violation. *Goodwin v. Johnson,* 132 F.3d 162, 187–88 (5th Cir.1997). Thus, contrary to Petitioner's position, the Supreme Court of Virginia properly construed the holdings of *Collier* and *Knox.*

With respect to the information that Lucas provided to District of Columbia detectives about the 1997 Starbucks triple homicide, the state court found that Lucas received no benefit from his cooperation. *Lovitt II,* 266 Va. at 236, 585 S.E.2d at 812. In that case, although a District of Columbia detective forwarded a letter to an Alexandria circuit court judge on Lucas's behalf, the letter itself gave no indication that Lucas and the police department had struck any specific deal or agreement. Absent clear and convincing evidence to the contrary, this Court must presume that the Supreme Court of Virginia's assessment of that letter's value is correct. *See* 18 U.S.C. § 2254(e)(1).

Petitioner's argument that the Supreme Court of Virginia misinterpreted and misapplied *Brady* is based, in large part, on the Fourth Circuit Court of Appeals case *Monroe v. Angelone,* 323 F.3d 286 (4th Cir.2003). In *Monroe,* upon habeas review of Petitioner's conviction, the district court found that prosecutors had suppressed information regarding a specific promise they made to a witness, offering her a reduced sentence in exchange for her crucial trial testimony. *Monroe,* 323 F.3d at

9. Petitioner contends that the due process violation was compounded by the prosecutors' failure to reveal that Lucas would be a witness until the day before trial. Because there is no existing authority requiring the Commonwealth to reveal the name of its witnesses

prior to trial, however, this claim has no merit. *See Watkins v. Commonwealth,* 229 Va. 469, 478–79, 331 S.E.2d 422 (1985), *cert. denied,* 475 U.S. 1099, 106 S.Ct. 1503, 89 L.Ed.2d 903 (1986).

301. There, the district court also found that the prosecution had failed to reveal the witness's history of offering information to authorities in exchange for some legal benefit. *Id.* The withheld information, according to that court, would have indicated that the witness both had a reputation of trying to barter information and was a "professional snitch." *Id.* at 315.

The immediate case is distinguishable from *Monroe* in several respects. First, unlike *Monroe,* prosecutors in the immediate case were unaware that Lucas had provided information to law enforcement authorities on three prior occasions. To prove a *Brady* violation, there must be a knowing suppression of exculpatory evidence. It is self-evident that a prosecutor cannot suppress or withhold information that is unknown to him or her. Thus, with respect to the three instances of cooperation by Lucas of which the prosecutors were unaware, it cannot be said that the government knowingly withheld impeachment evidence.

Second, *Monroe* is distinguishable because, in that case, prosecutors were aware of a specific deal in which the government attempted to gain the witness's testimony in exchange for legal consideration. As discussed above, as to the three instances of cooperation unknown to the prosecutors in the case under review, no such deal existed. Accordingly, *Monroe* does not convince this Court that the entirety of Lucas's cooperation is relevant in the context of a *Brady* analysis.

Petitioner counters that the Supreme Court of Virginia misapplied *Brady* by minimizing the prosecutor's duty to seek out exculpatory evidence on behalf of the accused. Furthermore, Petitioner contends that a prosecutor's constitutionally-mandated duty to ascertain information about its witnesses' previous cooperation is without jurisdictional boundaries. *See* Pet.'s Reply Br. 11–12. In essence, Petitioner argues that the prosecutor has an obligation to contact countless other jurisdictions in order to determine if a prospective witness has testified in that county or city in exchange for some legal benefit. Petitioner bases his extraordinary position on the settled rule that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555. To further support this argument, Petitioner cites to *Burrows v. Commonwealth,* 17 Va.App. 469, 438 S.E.2d 300, 302–04 (1993).

The language from *Kyles,* relied upon by Petitioner here, has historically been interpreted to hold a prosecutor responsible for any and all information possessed by *his or her own* agents. *See Kasi v. Angelone,* 300 F.3d 487, 505–06 (4th Cir.2002). Logically, such a rule would also embrace information and evidence possessed by state governmental agencies that are directly affiliated with the prosecuting jurisdiction. Beyond that, and with respect to the expanded interpretation of *Kyles* promoted by Petitioner, this Court can find no supporting authority. Moreover, to require a prosecutor to mine the records of every surrounding jurisdiction in both the Commonwealth of Virginia and the District of Columbia, absent some specific information triggering such an inquiry, would be patently unreasonable.

Petitioner's reliance on *Burrows,* here, is misplaced. Petitioner is correct that, in *Burrows,* the Virginia Court of Appeals held a prosecutor responsible for disclosing information concerning a witness's plea agreement in a neighboring jurisdiction. In that case, however, prior to trial, the prosecutor learned specific information about an informant's plea agreement in a nearby county but failed to disclose it.

The facts of the case at hand are significantly different.

After a thorough review of both the relevant law and evidence in this case, the Supreme Court of Virginia concluded that, aside from Lucas's cooperation in the Evans case, his unrequited assistance in other cases did not constitute exculpatory, impeachment evidence such that it was subject to disclosure. *Lovitt II*, 266 Va. at 246–47, 585 S.E.2d at 819. This Court is of the opinion that the Supreme Court of Virginia's conclusion is consistent with the overwhelming weight of United States Supreme Court jurisprudence and of those federal cases that interpret it. Thus, the state court's determination that Lucas's history of cooperation was not exculpatory was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.

This Court's review of this issue, however, does not end here. The Court must also determine whether the Commonwealth's failure to reveal Lucas's plea agreement in the Evans case, when coupled with other undisclosed exculpatory evidence, was sufficiently material to deprive Petitioner of a fair trial. That analysis follows.

### C. Materiality and the Cumulative Impact of the Suppressed Evidence on Petitioner's Defense

The final tier of this Court's *Brady* analysis involves an evaluation of whether the evidence Lovitt claims was unconstitutionally suppressed was "material" to his defense. Such an analysis involves an ex-

amination of what cumulative impact the undisclosed, exculpatory evidence might have had on Lovitt's case. *See Kyles*, 514 U.S. at 436 n. 10, 115 S.Ct. 1555; *Monroe v. Angelone*, 323 F.3d at 302; *Ellis*, 121 F.3d at 916. Here, Petitioner argues that, "[g]iven the absence of physical and eyewitness evidence linking Mr. Lovitt to the crime," the Commonwealth's suppression of evidence must have prejudiced his defense. Pet. at 19–20.

In order to determine whether a *Brady* violation is "material," the Court must consider whether, in the absence of the undisclosed evidence, the defendant received a fair trial, which is a trial resulting in a verdict worthy of confidence. *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375. Under settled principles regarding the disclosure of exculpatory evidence, the United States Supreme Court holds that exculpatory evidence is material if, had the evidence been disclosed to the defense, there would be a reasonable probability that the proceeding would have resulted in a different outcome. *Strickler*, 527 U.S. at 280, 119 S.Ct. 1936; *Fullwood v. Lee*, 290 F.3d 663, 687 (4th Cir.2002). Of course, the operative standard is "reasonable probability." [10]

Here, Petitioner contends that the Supreme Court of Virginia failed to properly assess the cumulative impact of the suppressed evidence and, instead, erroneously opted to conduct an item-by-item evaluation to determine materiality. Admittedly, the Supreme Court of Virginia found that only one item of suppressed evidence was exculpatory. Nonetheless, to

**10.** Petitioner argues that "because the prosecution knowingly misrepresented facts to the jury, the appropriate test for materiality is the presumptive prejudice standard under *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)." *See* Pet. at 12. According to the Supreme Court of Virginia, such a claim is procedurally barred. *Lovitt II*, 266 Va. at 244 n. 4, 585 S.E.2d at 817 n. 4. Even if it were not barred, however, because this Court has not found that the Commonwealth knowingly misrepresented facts, the presumptive "materiality standard" would not apply to this case.

determine materiality, it did conduct an analysis of the probable cumulative impact of all of the allegedly undisclosed items. *See Lovitt II*, 266 Va. at 245–47, 585 S.E.2d at 817–19. In so doing, the state appellate court concluded that the reasonable, probable impact of such evidence on Lovitt's defense was insufficient to undermine confidence in the outcome of the proceeding. *Id.*, 266 Va. at 247, 585 S.E.2d at 819. Now, the Commonwealth urges this Court to draw the same conclusion.

Petitioner's impact argument is predicated on the assumption that both the medical examiner's initial opinion and Lucas's entire history as a professional informant are exculpatory. Petitioner maintains that "[g]iven the lack of eyewitness or physical evidence linking Lovitt to the crime, Dr. Pierre–Louis's opinion that 3 ½-inch long scissors could not have been the murder weapon and Lucas's history as a 'professional' informant, considered alone or together, 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Pet. at 22 (citing *Kyles*, 514 U.S. at 435 (other citations omitted)).

Finding the medical examiner's statement not to be exculpatory, the Supreme Court of Virginia noted that it was not required to consider the issue of its materiality. Still, the court performed such an assessment and found:

> .... [T]he Commonwealth's failure to disclose this information could not have prejudiced Lovitt's defense because Dr. Pierre–Louis conceded at the evidentiary hearing in the present case that two of Dick's fatal wounds, designated on the autopsy report as wounds # 2 and # 3, could have been caused by the bloody scissors. This acknowledgment that the bloody scissors could have been the source of two of Dick's fatal wounds completely negates Lovitt's claim that

there is a reasonable probability that his trial would have resulted in a different outcome if Dr. Pierre–Louis' initial opinion had been provided to the defense. In addition, as the circuit court found, the evidence in the present case showed that trial counsel Denman Rucker investigated before trial whether the scissors like those presented at the autopsy could have caused Dicks' wounds. Upon consultation with a forensic expert, Rucker was told that scissors of that approximate size could have caused Dicks' wounds. Thus, Lovitt cannot show he was prejudiced by the Commonwealth's failure to inform him of Dr. Pierre–Louis' initial opinion, because he was aware of the issues involving scissors of that approximate size and investigated those issues as part of his defense in Lovitt's trial.

*Lovitt II*, 266 Va. at 245–46, 585 S.E.2d at 818.

With respect to the Commonwealth's failure to disclose information about Casel Lucas's cooperation, as discussed above, only one instance—relating to the Evans case—would have been exculpatory to the defense. None of Lucas's other attempts at cooperation were known to the prosecution, and none earned him a legal benefit for his assistance. Thus, Lucas's latter instances of cooperation were not exculpatory, and they need not be included in the Court's cumulative analysis.

On the other hand, as the Supreme Court of Virginia correctly concluded, there is one item of exculpatory, or impeachment, evidence that the Commonwealth failed to disclose, which was the fact that Lucas received a benefit for his cooperation in the Evans case. The state court was not persuaded, however, that such a failure placed Lovitt's trial in a posture that would undermine confidence in the verdict. In rejecting such an argu-

ment, the Supreme Court of Virginia pointed out that, before trial, Lovitt's counsel interviewed Lucas and learned, for herself, about his cooperation in the Evans case. During cross-examination, her co-counsel was then able to use that information to impeach him. Also, the jury was able to factor Lucas's thirteen, prior felony convictions into its assessment of his credibility. *Lovitt II*, 266 Va. at 247, 585 S.E.2d at 819.

Weighing the excluded evidence in the context of all of the evidence in the case, this Court finds that although the prosecution's case was largely circumstantial, the evidence against Petitioner was more than sufficient to support the jury's verdict. For instance, the cash drawer stolen from the pool hall at the time of the homicide was later found in pieces at the home of Petitioner's cousin. As Petitioner's cousin testified, shortly after the homicide, Lovitt brought the locked, metal cash drawer to his house and assisted him in "popping" it open. Petitioner then removed the cash, gave half to his cousin, and instructed his cousin to "get rid of" the drawer.

The orange-handled pair of scissors, containing the victim's blood and DNA, were found about fifteen (15) yards behind the pool hall, on a pathway leading from the pool hall toward Lovitt's cousin's house. These scissors, which were the alleged murder weapon, were forensically matched to the pry marks on the stolen cash drawer. As a pool hall employee testified, Lovitt had previously pried the cash drawer open with a pair of scissors.

Furthermore, a United States Capitol police officer positively identified Petitioner as having been present at the pool hall shortly before the murder occurred. Another witness, who was present at the pool hall and witnessed the fatal stabbing, identified Petitioner and was eighty (80) percent certain that he was the assailant.

All of this inculpatory evidence, when considered together, was sufficient to support the jury's verdict. Consequently, Petitioner's alleged admission of guilt to Lucas, although significantly incriminating, was not critical to the prosecution's case. Therefore, in this Court's opinion, the Commonwealth's evidence was strong enough that neither the medical examiner's initial scissors opinion nor Lucas's prior history of law enforcement cooperation would substantially have affected its weight or value.

Accordingly, even had both Dr. Pierre–Louis's initial opinion and Lucas's entire history of cooperation been found to be exculpatory, which this Court believes they are not, the prosecutors' suppression of such evidence still would not undermine confidence in the jury's verdict. *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555. This Court, therefore, is of the opinion that the findings and conclusions of the Supreme Court of Virginia on the issue of materiality are both reasonable and consistent with United States Supreme Court precedent.

## VIII. THE SUPREME COURT OF VIRGINIA UNREASONABLY REFUSED TO CONSIDER PETITIONER'S CLAIM OF PROSECUTORIAL MISCONDUCT

In addition to alleging that prosecutors withheld exculpatory information from him, Petitioner also contends that the Commonwealth, knowing from the medical examiner's opinion that three and one-half inch long scissors could not have caused the decedent's fatal wounds, intentionally misrepresented to the jury that the murder weapon was a pair of three and one-half inch long bloody scissors. The Supreme Court of Virginia declined to hear this claim, expressly finding that Petitioner had waived it by failing to include such a claim, the facts of which were known to

the Petitioner, in his original habeas petition. *Lovitt II*, 266 Va. at 244 n. 4, 585 S.E.2d at 817 n. 4. Because Petitioner has no other state remedies available to him, he now meets the technical requirements for exhaustion and can, at the very least, raise such a claim. *See Engle v. Isaac*, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

■ While Petitioner argues that he properly included the aforementioned misconduct claim as a subset of the issues he raised in state court, he also alleges that sufficient cause and prejudice exist so as to excuse any potential default of such a claim. *See Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. With respect to his latter position, Petitioner first maintains that he could not have raised such misconduct claims at the state level because the Commonwealth intentionally concealed critical facts he would have needed in order to do so. For example, Petitioner argues, at the time his habeas was filed in state court, he had not yet learned of the medical examiner's opinion excluding three and one-half inch scissors as the alleged murder weapon. Likewise, Petitioner had not yet been given the opportunity to depose the prosecutors. It was only after such depositions occurred that Petitioner was able to gather competent evidence indicating that prosecutors had "knowingly" misrepresented the bloody scissors as the murder weapon.

Second, Petitioner asserts that the prosecutors' alleged misconduct rises to the level of constitutional error and, thus, is sufficient as a matter of law to establish actual prejudice. In Petitioner's view, this argument is bolstered by the weakness of the prosecution's case. Because the Supreme Court of Virginia never considered such issues, however, should Petitioner succeed in demonstrating both cause and prejudice, this habeas Court must review his arguments *de novo*. *Daniels v. Lee*, 316 F.3d 477, 487 (4th Cir.2003).

To overcome a procedural bar, a petitioner must initially show "cause" for the default. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Reed v. Ross*, 468 U.S. 1, 13, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). In *Coleman*, 501 U.S. at 753, 111 S.Ct. 2546, the Supreme Court quoted from *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), to explain the logic and policy underlying the concept of cause:

"We think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." For example, "a showing that the factual legal basis for a claim was not reasonably available to counsel, ... or that 'some interference by officials' ... made compliance impracticable, would constitute cause under this standard."

*Coleman*, 501 U.S. at 753, 111 S.Ct. 2546 (quoting *Murray*, 477 U.S. at 488, 106 S.Ct. 2639). Relying on *Murray*, Petitioner argues that the Commonwealth affirmatively concealed facts critical to his prosecutorial misconduct claim. Moreover, "the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met." *See Reed*, 468 U.S. at 14, 104 S.Ct. 2901.

According to Petitioner, at the time his state habeas was filed, the prosecutors had not yet provided him with the medical examiner's initial opinion. That opinion, he later learned, included a determination that the scissors examined by the medical examiner at autopsy could not have been the murder weapon. Additionally, Petitioner notes, the full extent of the Commonwealth's misconduct did not become apparent to him until after he deposed the Assistant Commonwealth's Attorneys.

Those depositions, which took place during his post-conviction evidentiary hearing, were conducted after his petition was filed. It was not until after the evidentiary hearing that Petitioner gathered sufficient evidence to demonstrate that the prosecutors knew about the medical examiner's opinion and, despite that knowledge, intentionally misrepresented to the jury that the three and one-half inch scissors were the murder weapon.

On the contrary, the Commonwealth argues that, before trial, Petitioner received a copy of the autopsy report, a report in which the medical examiner both identified and described the scissors she examined during the autopsy. In addition, Petitioner's state court habeas petition was accompanied by a separate report in which the medical examiner described the scissors she examined at autopsy as inconsistent with the victim's wounds. Likewise, the medical examiner appeared at the evidentiary hearing and testified, as a witness for Petitioner, in a manner consistent with her report. Thus, given Petitioner's access to the medical examiner, argues the Commonwealth, it is illogical to deduce that Petitioner's counsel failed to learn about her initial report prior to filing Petitioner's state habeas petition.

Irrespective of Petitioner's ability to adduce specific evidence of the prosecutors' affirmative knowledge, there is no support for Petitioner's argument that his failure to include such misconduct in his state habeas petition is attributable to the Commonwealth's concealment of such evidence. Obviously, during the state habeas proceedings, Petitioner obtained a copy of the medical examiner's opinion and gained full access to the medical examiner herself. Consequently, Petitioner has failed to demonstrate a satisfactory "cause" for not including such a misconduct claim in his habeas petition to the Supreme Court of Virginia.

Ordinarily, because Petitioner is required to establish both "cause" and "prejudice" in order to overcome the predicate procedural bar, this would end the Court's review of this subject. Regardless, the Court will complete its analysis by considering Petitioner's prejudice arguments.

 In an attempt to demonstrate the requisite "prejudice" to enable review, Petitioner argues that the immediate case is indistinguishable from *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). In *Miller*, the Supreme Court vacated the sentence of a state prisoner because the prosecution had described a pair of stained undershorts as the "bloody shorts" and "a pair of jockey shorts stained with blood," even though the prosecutor knew that the shorts were stained with paint and not blood. *Miller*, 386 U.S. at 3, 87 S.Ct. 785. The Court concluded, in *Miller*, that the intentional use of false evidence by the prosecution violated the due process clause and warranted federal habeas relief. *Id.* at 7, 87 S.Ct. 785.

Petitioner argues that, like in *Miller*, the prosecutors in this case misrepresented to the jury that the bloody scissors found behind the pool hall were the murder weapon, even though they knew, at the time of trial, that the scissors could not have caused the victim's wounds. This argument is predicated on the medical examiner's initial opinion, which noted that the dimensions of two particular pairs of scissors were inconsistent with the victim's wounds. In order to measure the evidentiary value of that deduction in the context of Petitioner's misconduct claim, however, the Court must place it in context with the other evidence of the case.

It is the Commonwealth's contention that Petitioner cannot demonstrate prejudice because the undisputed and conclusive evidence shows that the scissors prosecutors offered into evidence *were* the murder

weapon. First, as the Supreme Court of Virginia concluded, the scissors examined by the medical examiner at autopsy were not the same scissors that contained the DNA and blood of the victim. *Lovitt II,* 266 Va. at 245–46, 585 S.E.2d at 818. Second, the bloody scissors found behind the pool hall and admitted into evidence were never examined by the medical examiner. *Id.* Finally, upon examination of a photograph of the bloody scissors, the medical examiner conceded that, from what she could see, several of the victim's wounds *could* be consistent with the alleged murder weapon. *Id.*

Notwithstanding the medical examiner's post-conviction concession, Petitioner steadfastly maintains that the medical examiner never deviated from her opinion that scissors with three and one-half inch blades could not have caused the victim's wounds without also causing tissue compression. Pet. at 15, 23. During the evidentiary hearing, the medical examiner denied any evidence of tissue compression and noted that, when reviewing the victim's wounds, she did not see the kind of marginal abrasions she would have expected to see if the scissors in the photograph had caused the decedent's wounds. *See Lovitt II,* 266 Va. at 233, 585 S.E.2d at 810–11. As the Commonwealth points out, however, on cross-examination the doctor also testified that it was possible that one of the blades from the bloody scissors could have caused three of the victim's wounds. *Id.,* 266 Va. at 234, 585 S.E.2d at 811.

 In order to satisfy the prejudice requirement, the "habeas petitioner must show 'not merely that the errors at ... trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray,* 477 U.S. at 494, 106 S.Ct. 2639 (quoting *United States v. Fra-*

*dy,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original)). "Such a showing of pervasive actual prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied 'fundamental fairness' at trial." *Id.*

In the Court's view, the immediate case is distinguishable from *Miller.* In *Miller,* the prosecution was unquestionably aware that the red stain on the victim's undershorts was paint rather than blood. Thus, their misrepresentation was both obvious and deliberate. In the immediate case, the prosecution clearly had a good faith basis for arguing that the blood-stained scissors, recovered from behind the pool hall, were in fact the murder weapon. Those scissors contained a DNA profile consistent with that of the victim. Furthermore, a forensic scientist was able to link tool impressions from a cash register drawer, taken from the murder scene, to the bloody scissors.

Although the Commonwealth's evidence regarding the murder weapon may not have been conclusive, it was unquestionably compelling. Consequently, with respect to their portrayal of the bloody scissors as the murder weapon, there is no evidence before this Court that the Commonwealth engaged in misconduct. Accordingly, it is the opinion of this Court that the Commonwealth's actions were neither prejudicial nor violative of Petitioner's due process rights.

## IX. THE DESTRUCTION OF EVIDENCE BY THE DEPUTY CLERK OF THE CIRCUIT COURT

The Petitioner next contends that the Supreme Court of Virginia unreasonably applied *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and *California v. Trombetta,* 467 U.S. 479,

104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), by "excusing the Commonwealth's intentional destruction of evidence." Pet. at 26–37. Here, Petitioner's argument focuses on two critical findings made by the state court: first, that the destruction of evidence by the Chief Deputy Clerk of Court was not undertaken in "bad faith;" and second, that the evidence was not material. *See Lovitt II,* 266 Va. at 241–43, 585 S.E.2d at 815–17.

As Petitioner maintains, "[t]he destruction of evidence has made it impossible, on post-conviction review, for Lovitt to conduct the scientific tests that could have exonerated him or helped prove that his trial counsel was ineffective. It has also impeded his efforts to prove that the bloody scissors, which played such a key role at the trial, were the same size as the scissors examined at the autopsy." Pet. at 26. Petitioner further asserts that "the destruction of evidence was intentional and contrary to state statutes, policies, and normal practices." *Id.* at 26–27. Respondent disagrees, arguing that to apply *Youngblood* and *Trombetta* to the post-verdict destruction of evidence would be to impermissibly extend, in the context of habeas litigation, the holdings of those cases.

Although Petitioner disputes the Supreme Court of Virginia's conclusions of law on these points, a re-statement of the pertinent facts will help to place this Court's analysis in context. Reviewing the record from the post-conviction evidentiary hearing, the Supreme Court of Virginia determined that the circuit court's findings of fact were neither plainly wrong nor lacking in evidentiary support. *Lovitt II,* 266 Va. at 229, 585 S.E.2d at 808. The state court, therefore, adopted those findings of fact and then reviewed the circuit court's recommended conclusions of law *de novo. Id.,* 266 Va. at 229–31, 585 S.E.2d at 808–10.

With respect to Petitioner's destruction of evidence claim, the state Supreme Court based its analysis on the following facts:

Testimony at the habeas hearing revealed that in April 2001, Robert C. McCarthy, Chief Deputy Clerk of the Circuit Court of Arlington County, drafted an order authorizing the destruction of the exhibits received in evidence at Lovitt's trial. McCarthy, who was responsible for evidence stored in the clerk's office, testified that he thought he was authorized to destroy the trial exhibits after receiving a mandate from this Court indicating that Lovitt's convictions were affirmed. McCarthy also stated that he decided to destroy the trial exhibits to create additional space in the clerk's office evidence room.

McCarthy drafted the evidence destruction order without consulting anyone in the Commonwealth's Attorney's office, the Attorney General's office, or the Arlington County Police Department. McCarthy also did not notify any of the circuit court judges, Lovitt's trial counsel, or his habeas counsel of the impending evidence destruction.

McCarthy drafted the order before May 2, 2001, the date that Code §§ 19.2–270.4:1 and –327.1 became effective. Code § 19.2–270.4:1 provides, in relevant part:

B. In the case of a person sentenced to death, the court that entered the judgment shall, in all cases, order any human biological evidence or representative samples to be transferred by the governmental entity having custody to the Division of Forensic Science. The Division of Forensic Science shall store, preserve, and retain such evidence until the judgment is executed
. . . .

. . . . .

E. An action under this section or the performance of any attorney representing the petitioner under this section shall not form the basis for relief in any habeas corpus or appellate proceeding.

With regard to such human biological evidence, Code § 19.2–327.1 provides, in relevant part:

A. Notwithstanding any other provision of law or rule of court, any person convicted of a felony may, by motion to the circuit court that entered the original conviction, apply for a new scientific investigation of any human biological evidence related to the case that resulted in the felony conviction . . . .

. . . . .

G. An action under this section or the performance of any attorney representing the petitioner under this section shall not form the basis for relief in any habeas corpus proceeding or any other appeal.

McCarthy took the destruction order prepared in Lovitt's case, along with between 15 and 20 other such orders, to the chambers of Judge Paul F. Sheridan. McCarthy left the orders in Judge Sheridan's chambers for entry without providing him any information concerning the relevant cases. Judge Sheridan, who did not conduct Lovitt's trial, entered the destruction orders on May 21, 2001, authorizing the destruction of all exhibits entered into evidence at Lovitt's trial. These exhibits, with the exception of the one chart, were destroyed a few days later.

Two deputy court clerks, Clifford P. Kleback and Gwendolyn Gilmore, testified that they spoke with McCarthy before he submitted the destruction orders to Judge Sheridan. Both deputy clerks told McCarthy, who was their immediate supervisor, that he should not destroy the evidence in Lovitt's case because it was a "capital case" and Lovitt had not been executed. Kleback, who was the clerk assigned to the courtroom during Lovitt's trial, stated that he told McCarthy that the case involved DNA evidence, and that he repeatedly advised McCarthy not to destroy the evidence. Both Kleback and Gilmore testified that McCarthy told them that the evidence could be destroyed because Lovitt's appeal had ended. Kleback and Gilmore deferred to McCarthy's decision and, at that time, did not report these conversations to either the clerk of the circuit court or to anyone in the prosecutor's office.

McCarthy testified that he did not recall speaking with Kleback and Gilmore before the evidence in Lovitt's case was destroyed. McCarthy also stated that he did not review Lovitt's case file to determine whether Lovitt's appellate remedies were exhausted but instead relied on this Court's mandate affirming Lovitt's convictions. According to McCarthy, when he drafted the destruction order, he may have known that Lovitt's case was a "capital murder case," but he was unaware that it was a "death penalty case." He further testified that at the time the destruction order was entered, he was not aware of any change in the law concerning the preservation of human biological evidence.

The circuit court found that there was no evidence that any official of the Commonwealth acted in bad faith or with the intent to destroy exculpatory evidence. The court stated in its findings that "McCarthy believed he had the authority to destroy the trial exhibits once he received the mandate" from this Court. The court also found that although Code § 19.2–270.4:1 became effective 20 days before entry of the destruction order,

McCarthy was unaware of the statute's provisions when the evidence was destroyed.

*Lovitt II*, 266 Va. at 229–31, 585 S.E.2d at 808–10.

In formulating its opinion, the Supreme Court of Virginia relied on the following findings and conclusions of the trial court:

In the present case, the circuit court concluded that "there [was] no evidence that any official of the Commonwealth acted in bad faith." The court also found that "there [was] no evidence to conclude that there was an intent by anyone in the Clerk's office to destroy exculpatory evidence." The court further found that while Robert McCarthy's judgment was erroneous, he "wanted to remove the box of exhibits from the evidence room to make additional space," and he "believed he had the authority to destroy the trial exhibits once he received the mandate indicating that Lovitt's appeal to the Virginia Supreme Court had been denied."

. . . . .

In addition, the circuit court found that at the time the evidence was destroyed, McCarthy was unaware that Code § 19.2–270.4:1, enacted 20 days before the destruction order was entered, mandated the storage of human biological evidence received in the case of a person sentenced to death. McCarthy's testimony adequately supports this finding. The circuit court made an additional factual finding that no employees of either the Commonwealth's Attorney or the Attorney General knew about the destruction of evidence until after the destruction occurred. This finding is supported by the testimony of Margaret Eastman, Barbara Walker, and McCarthy. The record also shows that Judge Paul F. Sheridan, who entered the evidence destruction order, had not presided over Lovitt's trial . . . .

*Lovitt II*, 266 Va. at 241–42, 585 S.E.2d at 815–16.

From these findings of fact, the Supreme Court of Virginia drew the following conclusions:

The circuit court's findings concerning the absence of bad faith are supported by the evidence and are not plainly wrong. McCarthy's actions, and the failure of Kleback and Gilmore to report his intentions to another supervisor, do not establish that an agent of the Commonwealth had knowledge of any exculpatory value of the trial exhibits at the time they were destroyed. *See Youngblood*, 488 U.S. at 56 n. *, 109 S.Ct. 333; *Holdren*, 16 F.3d at 60. The mere fact that the exhibits included DNA evidence, and that Kleback may have related this information to McCarthy, does not establish that McCarthy was aware that an analysis of some of the DNA evidence had produced inconclusive results, or that such evidence may have been subject to further testing. Moreover, even if McCarthy had been aware of these considerations, such awareness would not have met the constitutional standard of materiality under *Youngblood*, because Lovitt can assert no more than the mere possibility that further testing could have exculpated him. *See Youngblood*, 488 U.S. at 56 n. *, 109 S.Ct. 333.

*Lovitt II*, 266 Va. at 241–42, 585 S.E.2d at 816. Ultimately, the Court held that "the record lacks any evidence that an agent of the Commonwealth acted in bad faith with regard to the destruction of the trial exhibits." *Id.*, 266 Va. at 242, 585 S.E.2d at 816.

In reviewing Petitioner's claim, this Court is mindful that "a federal habeas court may not issue [a] writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams,* 529 U.S. at 411, 120 S.Ct. 1495.

■ To that end, Petitioner argues that two of the Supreme Court of Virginia's specific conclusions of law, both of which were central to that Court's decision on the destruction of evidence issue, are "an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). In other words, on these points, Petitioner contends that although the state court correctly identified the governing legal principle from existing Supreme Court jurisprudence, it unreasonably applied that principle to the facts of this case. On habeas review, the appropriate inquiry for this Court is whether the state court's application of federal law was *objectively* reasonable. *Bell,* 535 U.S. at 694, 122 S.Ct. 1843.

As his first argument, Petitioner maintains that the Supreme Court of Virginia unreasonably misapplied federal law when it determined that the Chief Deputy Clerk of Court did not destroy evidence in bad faith. At this juncture, a number of relevant facts bear repeating. At the time the evidence was destroyed, Petitioner's case was before the United States Supreme Court for direct review. It is unclear whether, at that time, the Chief Deputy Clerk made any effort to examine Petitioner's case file in order to ascertain the legal posture of his case. He did acknowledge, however, that he knew the Supreme Court of Virginia had recently affirmed Petitioner's conviction.

Additionally, several weeks prior to the destruction, a new statute had been enacted. That statute directed Clerks of Court to preserve evidence in all criminal cases until the exhaustion of all appellate remedies and in all death cases until execution. Va.Code § 19.2–270.4:1 (1950, as amended). Likewise, the official Arlington Circuit Court Clerk's Office policy in effect at that time was to preserve evidence in death penalty cases until all appeals had run their course. As the state court found, the Chief Deputy Clerk had no knowledge of the new preservation statute. Before destroying the evidence, however, he was advised by two of his subordinates not to do so. Of those colleagues, one counseled against the destruction specifically because Petitioner's is a death penalty case.

In his own defense, the Chief Deputy Clerk explained that he was unfamiliar with the new law and was merely performing a routine housecleaning, meant to rid the storage room of unnecessary exhibits. Petitioner rejoins that state officials are presumed to know the law. Furthermore, Petitioner points out that, prior to obtaining the court order authorizing the destruction of exhibits, the Chief Deputy Clerk failed to consult with the investigating detective, the Office of the Commonwealth's Attorney, or the Virginia Attorney General's Office.

Reviewing the Chief Deputy Clerk's actions, the Supreme Court of Virginia concluded that although he was negligent and exercised poor judgment, the clerk did not act in "bad faith" as contemplated by *Youngblood* and *Trombetta.* This conclusion was predicated on the state court's finding that the Chief Deputy Clerk did not specifically intend to destroy exculpatory evidence. Petitioner now argues that the Supreme Court of Virginia's conclusion is not only inconsistent with the holdings of those cases, but it amounts to an unreasonable application of the underlying jurisprudence.

In *Youngblood,* the United States Supreme Court detailed how a court, confronted with the "failure of the State to preserve evidentiary material of which no

more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," should analyze due process. *Youngblood,* 488 U.S. at 57–58, 109 S.Ct. 333. Specifically, the Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially useful evidence* does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. 333 (emphasis added). In the immediate case, Petitioner contends that the state court misunderstood the phrase "potentially useful evidence."

Construing the phrase "potentially useful evidence," the Supreme Court of Virginia drew guidance from an unnumbered footnote in *Youngblood* wherein the United States Supreme Court reiterated several relevant principles previously announced in *Trombetta. See Youngblood,* 488 U.S. at 55–58, 109 S.Ct. 333. *Trombetta,* at its core, articulates a clear, constitutional duty on the part of the government to preserve evidence both of potential exculpatory value as well as that of reasonably obvious exculpatory value. *Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528.

As the *Youngblood* footnote, mentioned above, notes:

First, *Trombetta* speaks of evidence whose exculpatory value is 'apparent.' 467 U.S. at 489, 104 S.Ct. 2528. The possibility that the [destroyed evidence] could have exculpated Respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta.* Second, we made clear in *Trombetta* that the exculpatory value of the evidence must be apparent '*before* the evidence was destroyed.' *Ibid.* (emphasis in original).

*Youngblood,* 488 U.S. at 56–57 n. *, 109 S.Ct. 333. *See also Holdren v. Legursky,* 16 F.3d 57, 60 (4th Cir.1994).

According to the Supreme Court of Virginia, the record did not show that the Chief Deputy Clerk knew that "an analysis of some of the DNA evidence had produced inconclusive results, or that such evidence may have been subject to further testing." *Lovitt II,* 266 Va. at 242, 585 S.E.2d at 816. Based on its reading of *Youngblood* and *Trombetta,* paying particular attention to the footnote discussed above, the state Supreme Court further concluded that "such awareness would not have met the constitutional standard of materiality under *Youngblood,* because Lovitt can assert no more than the mere possibility that further testing could have exculpated him." *Id.*

Petitioner's current, unsubstantiated assertion—that further testing would likely prove, conclusively, that some of the blood stains identified on certain items of evidence actually originated from him and not from the victim—adds gloss to his argument but little texture to the analysis. Such an argument is analogous to that rejected in *Illinois v. Fisher,* 540 U.S. 544, 124 S.Ct. 1200, 1202, 157 L.Ed.2d 1060 (2004), wherein the contested evidence provided the defendant's "only hope for exoneration." To meet the *Youngblood* standard, more particularity is required. *Id.*

In the final analysis, the Supreme Court of Virginia rejected Petitioner's due process claim, holding that the record did not support a conclusion that the Chief Deputy Clerk acted in bad faith by destroying the evidence and that the evidence did not meet the "potentially exculpatory value" standard. *Lovitt II,* 266 Va. at 243, 585 S.E.2d at 816–17. Based on the established standard of review in habeas corpus cases, this Court is of the opinion that the Supreme Court of Virginia reasonably construed and applied *Trombetta* and *Youngblood.* Consequently, the Court rejects

Petitioner's first destruction of evidence argument.

The second alleged flaw in the Supreme Court of Virginia's reasoning, as raised by the Petitioner, is a subset of the foregoing analysis. Petitioner contends that the appellate court's finding that the destroyed evidence was not *material* was an unreasonable application of *Youngblood* and *Trombetta*. Petitioner also argues that the Supreme Court of Virginia "misinterpreted the governing law by requiring Mr. Lovitt to prove that the lost evidence would have exonerated him." Pet. at 35; *see also Lovitt II*, 266 Va. at 242, 585 S.E.2d at 816 (noting that "even if [the Chief Deputy Clerk] was aware of these considerations, such awareness would not have met the constitutional standard of materiality under *Youngblood*, because Lovitt can assert no more than the mere possibility that further testing could have exculpated him"). In Petitioner's view, this burden-shifting interpretation is contrary to *Youngblood*.

Applying the "constitutional materiality" standard, Petitioner maintains that the Supreme Court of Virginia created an impermissible burden, requiring a petitioner to demonstrate that missing evidence will necessarily exculpate him. This Court disagrees with Petitioner's interpretation of the appellate court's holding. The constitutional materiality standard employed by the Supreme Court of Virginia comes directly from *Youngblood*, 488 U.S. at 56 n. *, 109 S.Ct. 333. In its construction of both the word "apparent" and the phrase "potentially exculpatory value" to import something more than a mere possibility of exculpation, the state court relied on the United States Supreme Court's ruling in *Youngblood*. Thus, it is the opinion of this Court that the Supreme Court of Virginia utilized the appropriate standard by which to measure the findings of the circuit court, that is, a logical and reasonable interpretation of *Youngblood* and *Trombetta*.

Finally, the Court will turn to Respondent's impermissible extension argument. Here, Respondent contends that "at the time Lovitt's case became final on direct appeal, and even today, there is no precedent from the United States Supreme Court extending the *Youngblood* rule to post-conviction destruction of evidence. An extension of that rule thus impermissibly would violate the 'new rule' doctrine." Respondent's Mem. at 26; *see also Horn v. Banks*, 536 U.S. 266, 271–72, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002).

The Supreme Court of Virginia decided that resolution of such an issue was unnecessary to its disposition of the case. That court, therefore, assumed without deciding that "a habeas petitioner may assert a due process claim regarding the post-trial destruction of evidence, and that the *Youngblood* standard governing pre-trial destruction of evidence also applies to a due process claim involving evidence destroyed post-trial." *Lovitt II*, 266 Va. at 240–41, 585 S.E.2d at 815. Consequently, the Supreme Court of Virginia concluded that resolution of the issue was unnecessary because Petitioner failed to establish that he was entitled to relief under the *Youngblood* standard. *Id.*

Under *Caspari v. Bohlen*, 510 U.S. 383, 389–96, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994), Respondent's impermissible extension argument is not the kind of issue that necessarily requires a threshold resolution. Notwithstanding the state court decisions cited in the petition, this Court is inclined to agree that the rule announced in *Youngblood*, which was based upon *Trombetta*, does not extend due process protection to post-trial destruction of evidence or to the actions of state officials who are unrelated to the prosecution of the case. That issue, however, is best reserved for a higher

court. This Court agrees with the Supreme Court of Virginia; resolution of the issue is unnecessary in the context of this habeas action.

Consequently, this Court is of the opinion that, in rejecting Petitioner's post-appeal destruction of evidence claim, the Supreme Court of Virginia did not unreasonably apply *Youngblood* and *Trombetta.* Therefore, Petitioner's request for relief on that basis will be denied.

## X. *STRICKLAND v. WASHINGTON* AND PETITIONER'S CLAIM THAT HIS COUNSEL WERE INEFFECTIVE DURING THE PENALTY PHASE OF TRIAL

In opposition to Respondent's motion to dismiss, counsel for Petitioner passionately argued, at oral argument, that if the jury had been made aware of the severe childhood abuse he suffered, there is a reasonable probability that at least one juror may have voted to spare his life. Petitioner maintains that the failure of his trial counsel to conduct a thorough investigation into both his personal background and his family history deprived him of his Sixth Amendment right to effective assistance of counsel, which casts significant doubt as to the reliability of the death sentence imposed upon him. The Commonwealth disagrees, arguing that the Supreme Court of Virginia appropriately rejected such an argument on its merits.

■■■■ Although Petitioner finds fault in his trial counsel's failure to introduce mitigating evidence of childhood abuse, his challenge at this stage is primarily focused on the failure of counsel to conduct a thorough investigation into his troubled history, as is required by *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In crafting their mitigation strategy for the penalty phase of trial, counsel's reasoning is ordinarily entitled to deference. The strategy itself, however, must be an informed one, reached only after the completion of a thorough investigation. *Id.*

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court articulated its Sixth Amendment standard for measuring the effectiveness of counsel. There, the Court announced a two-part test for evaluating a claim of ineffective assistance. First, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. In its evaluation of an attorney's performance, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. This presumption of soundness includes strategic decisions viewed in context of the circumstances at hand. *Id.* As the United States Supreme Court has recently pointed out, however, " 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.' " *Wiggins v. Smith,* 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052).

The Supreme Court further noted, in *Wiggins,* that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the 'constitutionally protected independence of counsel' at the heart of *Strickland.*" *Wiggins,* 539 U.S. at 533, 123 S.Ct. 2527 (citation omitted). *Wiggins* also advises that "a court must consider not only

the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527, 123 S.Ct. 2527.

Once a petitioner demonstrates that his counsel's representation fell below an objective standard of reasonableness, then in order to obtain relief, he must also show prejudice. To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Reviewing Petitioner's ineffective assistance claim, the Supreme Court of Virginia chose to bypass the performance prong of *Strickland,* proceeding instead directly to an analysis of the prejudice the defendant suffered because of the alleged deficiencies. *Strickland* permits such a procedure. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

Petitioner argues that the facts of the immediate case are indistinguishable from those of *Wiggins* and *Williams,* each of which led the United States Supreme Court to set aside death sentences. In his view, the failure of the Supreme Court of Virginia to follow the teachings of *Wiggins* and *Williams,* on indistinguishable facts, warrants a finding that the state appellate court misapplied Supreme Court precedent. In light of both this contention and Petitioner's suggestion that the Supreme Court of Virginia gave "short shrift to this claim," it is necessary to set out in detail the relevant findings and conclusions of that Court:

We turn now to consider Lovitt's argument that trial counsel were ineffective in the penalty phase of the trial and that he suffered resulting prejudice. His contentions primarily address trial counsel's alleged failure to investigate his family background, which he asserts contained evidence of drug and sexual abuse, and counsel's failure to present more extensive evidence of his personal history to the jury.

Guided by *Strickland,* we directly consider the issue whether Lovitt suffered prejudice sufficient to undermine confidence in the outcome of his sentencing as a result of his counsel's failure to investigate and present certain mitigation evidence. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2542; *Williams,* 529 U.S. at 391, 120 S.Ct. 1495. We focus our analysis on the *Wiggins* decision in which the Supreme Court, applying *Strickland,* recently invalidated a habeas petitioner's death sentence based on trial counsel's failure to investigate and present certain mitigation evidence to the jury at the petitioner's sentencing proceeding. *Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2541–44.

In *Wiggins,* the petitioner was convicted of capital murder in a bifurcated proceeding. *Id.* at ——, 123 S.Ct. at 2532. During the penalty phase, trial counsel elected to present no mitigation evidence, instead seeking to prove that the evidence was insufficient to establish that the defendant was the actual perpetrator of the murder rather than a lesser participant in the crime. *Id.* at ——, 123 S.Ct. at 2532–33. Under Maryland law, this determination is made at the penalty phase of a capital murder trial, and a jury may impose the death penalty only if it determines that the defendant was the actual perpetrator of the

offense. *See* Md.Code Ann., Crim. Law § 2–202 (2002).

Prior to adopting this approach, trial counsel had the defendant evaluated by a psychologist, who concluded that the defendant "had an IQ of 79, had difficulty coping with demanding situations, and exhibited features of a personality disorder." *Wiggins,* 539 U.S. ——, 123 S.Ct. at 2536, 156 L.Ed.2d 471. However, the psychologist's report did not describe or address the defendant's extensive personal history. *Id.* at ——, 123 S.Ct. at 2536. Trial counsel also reviewed court and social services records, which referred to the defendant's "misery as a youth" and to the fact that he had spent most of his childhood in foster care. *Id.* at ——, 123 S.Ct. at 2536. At the habeas hearing in *Wiggins,* the petitioner presented evidence from a psychologist that petitioner "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother." *Id.* at ——, 123 S.Ct. at 2542. Evidence from the psychologist further indicated that the petitioner "suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." *Id.* at ——, 123 S.Ct. at 2542. In addition, the evidence showed that the petitioner was homeless for a period of time and had "diminished mental capacities." *Id.* at ——, 123 S.Ct. at 2542.

The Supreme Court held that trial counsel's decision to limit their investigation of mitigation evidence was unreasonable, because the evidence counsel had seen in the social services records would have led a reasonably competent attorney to conduct a further investigation. *Id.* at ——, 123 S.Ct. at 2541–42. The Court concluded that the petitioner was prejudiced by counsel's unprofessional errors of judgment because the mitigating evidence that counsel failed to discover and present was "powerful." *Id.* at ——, 123 S.Ct. at 2542. In reaching this conclusion, the Court also observed that the petitioner's social history contained "little of the double edge we have found to justify limited investigations in other cases." *Id.* at ——, 123 S.Ct. at 2542.

Unlike the record in *Wiggins,* the record from Lovitt's trial shows that counsel presented some recent personal history as mitigation evidence at the penalty phase of the trial. That evidence, provided by four sheriff's deputies working at the Arlington jail, showed that Lovitt had made a very good adjustment to his incarceration and had participated in Bible study, in Alcoholics Anonymous meetings, and in voluntary work programs.

In addition, trial counsel presented some family history evidence through the testimony of Lamanda Jones, Lovitt's stepsister, who testified about the help that Lovitt had provided to his younger siblings in various aspects of their upbringing. She stated that Lovitt helped take care of the other children because his stepfather was an alcoholic and "wasn't allowed around us most of the time." According to Jones, Lovitt regularly fed the younger children and helped them get ready for school. Jones also testified that, as an adult, Lovitt visited her children every weekend and that she trusted him to be with them.

At the habeas hearing, the evidence of Lovitt's family and social history consisted of .testimony from family members and various records from the court, social services, and juvenile corrections. Lovitt did not present testimony from a psychologist or a psychiatrist concerning his family history and any effect that such history may have had on his development.

The testimony of Lovitt's family members at the habeas hearing consisted of mostly general statements concerning abuse directed toward Lovitt by his stepfather. Sherry Taylor, Lovitt's cousin, testified that Lovitt's stepfather was "very abusive" toward Lovitt and the other children. However, Taylor did not describe any abuse specifically directed at Lovitt, other than the fact that the stepfather "cursed [Lovitt] out ... all the time."

Taylor also testified regarding Lovitt's good qualities, stating that he was very protective of his siblings, helpful, and "good with kids." She further stated that all the children in the family loved him.

Jones testified that Lovitt's stepfather abused alcohol and drugs, and that she had observed him "beat" Lovitt with a telephone cord on a frequent basis. Jones also stated that Lovitt's stepfather "molested" all the children, and that such abuse was a "regular occurrence." However, Jones did not relate any particular type or instance of sexual abuse directed at Lovitt, and her only specific testimony regarding sexual abuse concerned some of the other children.

Addressing Lovitt's good qualities, Jones stated that Lovitt tried to protect his younger siblings from their father's abuse. She also indicated that Lovitt was a "father figure" to her during her childhood, and stated that he was "like [a] father" to her own children.

Tonjala Carter, another stepsister, testified that Lovitt's stepfather abused alcohol and drugs and was very violent toward Lovitt. However, her testimony concerning such violence was limited to a general description that the stepfather was "always hitting on him, always cursing at him," and was very "mean."

Carter also related that Lovitt had good qualities as a brother and an uncle. She stated that he often tried to protect the younger siblings from their father and was a "father figure" to them in several of the aspects of their daily life. Carter also testified that Lovitt was "very good" with his nieces and nephews.

The various records introduced at the habeas hearing were equivocal in some respects and could have been viewed by a jury as either evidence in aggravation or in mitigation of the offense. For example, Lovitt's substance abuse and medical records showed that Lovitt had an antisocial personality disorder and "polysubstance" dependence. The records stated that Lovitt began drinking alcohol, supplied by his stepfather, at the age of five, and began using marijuana at the age of eight.

These records also showed that Lovitt abused many different types of drugs as an adult, including heroin, amphetamines, "acid," and phencyclidine. The records described Lovitt as having a "serious problem with his anger" and having "difficulty in respecting others." Also, in some of these records, Lovitt described his family as "growing up close" and stated that he "had everything he needed."

In his juvenile court records, Lovitt's childhood home was described by a caseworker as being "very clean and nicely furnished," and his mother and stepfather were described as "strong individuals" who provided Lovitt with "a stable home life." Lovitt's childhood home was further described by a caseworker "as being well-maintained and adequate for the family's needs." In addition, a clinical assessment contained in the juvenile records stated that Lovitt did not relate any problems with his family and "reported no difficulties in the relationship with his stepfather." However, other juvenile records showed that Lovitt described his stepfather as a "heavy drink-

er [who] would sometimes become abusive toward his wife and children."

The juvenile records also contained references to Lovitt's lack of remorse for his behavior, lack of empathy for others, lack of respect for the law, and propensity to blame others for trouble that he instigated. These records also described Lovitt as being "physically aggressive" and "manipulative," and as having assaulted other juveniles at the Beaumont Correctional Center.

In determining prejudice, we "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2542; *see also Williams,* 529 U.S. at 397–98, 120 S.Ct. 1495. The evidence in aggravation included the brutal nature of the attack on Dicks, and the fact that Lovitt murdered Dicks solely to eliminate any witness to the robbery. Lovitt's prior record contained numerous felonies including attempted robbery, several burglaries and larcenies, and drug violations. While incarcerated for some of these crimes, Lovitt was charged with many disciplinary violations, which included assault, manufacturing "shank handles," and possession of cocaine. He was on parole at the time he murdered Dicks.

The mitigation evidence concerning Lovitt's home life as a child is mixed, with some evidence from his juvenile records suggesting that the situation might not have been as difficult as the testimony at the habeas hearing indicated. In addition, there is no evidence describing the nature or extent of sexual abuse allegedly inflicted on Lovitt by his stepfather. Without such evidence, this Court would have to resort to speculation to consider any sexual abuse that Lovitt may have suffered.

The evidence regarding Lovitt's stepfather's other actions toward him is somewhat general in nature. Nevertheless, the evidence in mitigation at the habeas hearing contained information about Lovitt's stepfather having provided Lovitt alcohol at an early age and having hit him repeatedly with a telephone cord and cursing him.

The evidence in mitigation also included descriptions of Lovitt helping to take care of his siblings to compensate for Lovitt's alcoholic stepfather's failure to assume this role. However, the jury was informed of this fact, although in less detail, when Lamanda Jones testified at the penalty phase proceeding. There also was evidence in mitigation, which was not presented by trial counsel, that Lovitt helped protect his younger siblings from abuse by their father. The evidence concerning Lovitt's extensive drug abuse and antisocial personality disorder is evidence of a type that the Court in *Wiggins* termed "double edge." *See Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2542. As such, this evidence could be viewed both in aggravation and in mitigation of the offense. *See Burger,* 483 U.S. at 793–94, 107 S.Ct. 3114; *Darden,* 477 U.S. at 186–87, 106 S.Ct. 2464. Lovitt's juvenile and other records are evidence reflecting a "double edge," and show that he began a cycle of crime and aggressive behavior at an early age and continued this pattern throughout his adult life, despite the many occasions he was offered assistance to resolve his problems.

We also observe that there is no evidence in the record from a psychologist or a psychiatrist providing an evaluation of Lovitt's mental health. Thus, there is no evidence directly addressing the effect Lovitt's family life may have had on his development. The absence of such evidence represents a failure of proof regarding Lovitt's contention that he was prejudiced by trial counsel's failure to present extensive evidence of his fam-

ily and social history at the penalty phase proceeding.

In addition, there is no evidence in the record that Lovitt has a diminished mental capacity. This aspect of the case represents a major distinction from the evidence presented in *Wiggins,* which showed that the petitioner exhibited "borderline retardation." *Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2533.

The evidence in *Wiggins* also showed that the petitioner had no prior convictions. *Id.* at ——, 123 S.Ct. at 2543. By contrast, as indicated above, Lovitt's prior record depicts a person who, in essence, was a "career criminal" unaffected by the many attempts to offer him rehabilitative services.

Upon reviewing the evidence in aggravation and in mitigation of the offense presented at the penalty phase of the trial and at the habeas hearing, we conclude that Lovitt has failed to demonstrate that his defense was prejudiced by trial counsel's failure to investigate and present the available mitigation evidence. Based on all the evidence before us, we hold that the record fails to show that, but for his trial counsel's stated failures, there is a reasonable probability that the result of the proceedings would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2542; *Williams,* 529 U.S. at 391, 120 S.Ct. 1495. In short, the record before us does not undermine confidence in the outcome of the proceedings. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Wiggins,* 539 U.S. at ——, 123 S.Ct. at 2542; *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

Our conclusion in this regard is not altered by the Supreme Court's decision in *Williams.* There, the Court concluded that a defendant had suffered prejudice resulting from his counsel's failure to present substantial available mitiga-

tion evidence at the penalty phase of his capital murder trial. *Williams,* 529 U.S. at 396, 120 S.Ct. 1495.

The available mitigation evidence that was not presented in *Williams* showed that the petitioner had suffered extreme abuse and neglect in his early childhood years. *Id.* at 395, 120 S.Ct. 1495. The evidence indicated that the petitioner's parents both had been imprisoned for criminally neglecting the petitioner, "that Williams had been severely and repeatedly beaten by his father, [and] that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home)." *Id.* In addition, the evidence available, but not presented, in *Williams* indicated that the petitioner was " 'borderline mentally retarded' and did not advance beyond sixth grade in school." *Id.* at 396, 120 S.Ct. 1495.

In contrast, the record before us does not contain extensive evidence of abuse that Lovitt suffered as a child. Nor does the evidence suggest that he has a diminished mental capacity. In fact, Lovitt obtained a high school equivalency diploma, commonly known as a G.E.D. degree, as an adult. Thus, the evidence before us does not raise the same concerns that the Supreme Court in *Williams* held "might well have influenced the jury's appraisal of [the petitioner's] moral culpability." *Id.* at 398, 120 S.Ct. 1495.

Finally, we observe that in reaching its conclusion in *Williams* that the petitioner suffered prejudice as a result of his counsel's errors, the Supreme Court also observed that trial counsel did not introduce evidence from certain witnesses who were not related to the petitioner and were available to testify. *Id.* at 396, 120 S.Ct. 1495. The Court observed that a certified public accountant, who had visited Williams frequently as part

of a prison ministry program, had been available to testify that Williams appeared to thrive in the structured environment of prison and had earned a carpentry degree while incarcerated. *Id.* The Court also stated that certain prison officials would have testified that, in their opinion, Williams was not likely to act in a dangerous or violent manner while incarcerated. *Id.*

At Lovitt's trial, however, the jury did hear testimony regarding his good adjustment to prison life while awaiting trial. As we have already noted, four correctional officers testified to this effect at the penalty phase proceeding. Thus, for all the above reasons, we conclude that the nature and amount of mitigation evidence that was proved to be available, but not presented, in Lovitt's case is materially different from the available mitigation evidence not presented in *Williams.*

*Lovitt II,* 266 Va. at 252–59, 585 S.E.2d at 822–26.

The Supreme Court of Virginia conducted a careful, comparative analysis between the facts in *Wiggins* and *Williams* and those in the case at hand. In *Wiggins,* trial counsel presented no evidence in mitigation even though counsel was aware that the petitioner's social service records revealed an extensive history of childhood abuse, including incidents of molestation and rape while he resided in foster care. Moreover, in that case, there existed psychological reports that included both the effect of the petitioner's background on his behavior and a specific finding of diminished capacity. Aside from some prior criminal activity, nothing in either Wiggins's social history or his psychological evaluations would have compelled or facilitated a prosecution argument of future dangerousness.

The Supreme Court, in *Wiggins,* concluded that counsel's investigation of the petitioner's background was unreasonable. Of particular concern was trial counsel's decision to limit the scope of their mitigation evidence to that contained within a pre-sentence investigation report and Wiggins's social services records, even though those records contained evidence that, in the Supreme Court's opinion, would have led a reasonably competent attorney to conduct additional investigation. *Wiggins,* 539 U.S. at 533–34, 123 S.Ct. 2527.

In the immediate case, trial counsel did introduce some evidence in mitigation, including the testimony of Petitioner's stepsister and that of four correctional officers. The stepsister described how Petitioner played an integral role in raising his siblings by caring for them, serving their meals, and preparing them for school. She also described her father, who is Petitioner's stepfather, as an alcoholic. The four correctional officers explained how Petitioner had adjusted well to confinement and had completed a number of prison programs.

Unlike that of Wiggins, Lovitt's social history contained substantial, damaging information. Contrary to Petitioner's contention, his trial counsel collected hundreds of documents, including all of the records from the many juvenile and adult correctional institutions that housed him throughout his life. (J.A. at 3225.) These records, as the Supreme Court of Virginia noted, contained potentially damaging information about Petitioner's history of drug abuse, his violent tendencies, and his aggressive behavior. In addition, each of Petitioner's attorneys was personally familiar with their client's familial history of criminal behavior Counsel had represented several of Lovitt's siblings in prior criminal proceedings. Consequently, they believed that introducing extensive evidence of Petitioner's family background would invite an avalanche of damaging evidence about

the family's criminal tendencies. (J.A. at 3223.) Consequently, and considering the totality of the circumstances, it is this Court's opinion that counsel made a reasoned, informed, and strategic decision not to introduce Petitioner's social history records during the sentencing phase of trial.[11]

The Supreme Court of Virginia also distinguished Petitioner's case from the facts in *Williams*. In *Williams*, the petitioner had a sixth grade education, suffered borderline mental retardation, and had a documented history of severe and repeated instances of physical abuse. Both of his parents were jailed for criminal neglect, and he spent two years committed to the Department of Social Services. A portion of that time, Williams spent in an abusive foster home. Petitioner's record of abuse, by way of contrast, is neither as extensive nor as well-documented. There is no evidence that Lovitt suffered from any form of diminished capacity. On the contrary, while incarcerated he was able to earn his GED.

Critical to the United States Supreme Court's finding of prejudice in *Williams,* was trial counsel's failure to call significant witnesses. In *Williams*, a certified public accountant who had interacted with Williams in the prison ministries program was prepared to testify that Williams was thriving in a prison environment. Moreover, correctional personnel were prepared to testify that, in their view, if imprisoned Williams was unlikely to behave in a dan-

gerous or volatile manner. The jury never heard the witnesses' testimony, however, because Williams's counsel failed to call mitigation witnesses on his behalf. By way of comparison, Petitioner's jury did hear the testimony of several correctional officers, each of whom attested to his positive adjustment to prison life. Thus, counsel's performance with respect to mitigation in Lovitt's case clearly outshines that of counsel in *Williams*.

 Although Petitioner asserts that his trial counsel should have introduced mitigating evidence from his family history, the bulk of his complaint emanates from his contention that counsel's decision not to introduce mitigating evidence was not objectively reasonable based upon the limited nature of their investigation. For example, Petitioner argues that, with the exception of his stepsister, trial counsel failed to interview his family members about his troubled childhood. Moreover, he contends, counsel's lone interview of his stepsister was inexcusably shallow and last-minute, having been conducted during the penalty phase of trial. Petitioner also alleges that his attorneys failed to review his social service, educational, and medical records and his correctional history in an attempt to unearth mitigating evidence. As this Court concluded above, however, trial counsel conducted an appropriate review of hundreds of records pertaining to Petitioner's social and correctional history.[12] Such an argument, therefore, carries

---

11. The Supreme Court of Virginia declined to assess the performance of counsel, opting to proceed directly to a prejudice analysis. Although not essential to this Court's review of the prejudice issue, some discussion of the reasonableness of counsel's decisions serves to further buttress the conclusion of this Court. To the extent that this Court's impression of counsel's performance ventures beyond that of the state appellate court, such review is *de novo*. *See Daniels v. Lee*, 316 F.3d 477, 487 (4th Cir.2003).

12. Petitioner finds further fault with trial counsel's failure to request the appointment of a qualified mental health expert. The Commonwealth counters that such testimony would have invited extensive cross-examination on extremely damaging elements of Petitioner's social history, bearing directly on his future dangerousness. Again, under the circumstances at hand, this Court finds counsel's strategic decision not to hire such an expert to be reasonable.

no weight in this portion of the Court's analysis.

Petitioner maintains that his counsel's background investigation fell short of what is required by both the prevailing professional norm and the standards established by the American Bar Association. The latter standards, of course, are widely accepted by federal courts. *See Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527. The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigation evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment of Performance of Counsel in Death Penalty Cases [hereinafter "ABA Guidelines"] 11.4.1(c), at 93 (1989). Federal courts have frequently relied upon the ABA standards as "guides to determining what is reasonable." *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527 (citations omitted). The ABA standards suggest that the scope of counsel's inquiry should include the defendant's medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experiences, and religious and cultural influences. ABA Guidelines, 11.8.6, at 113.

Urging this Court to reject Petitioner's Sixth Amendment claim, the Commonwealth emphasizes that, from their prior. representation of his family members, Petitioner's trial counsel gained familiarity with his personal and family background. For example, the circuit court judge conducting the state habeas hearing found that "counsel was aware that all five of Lovitt's brothers were incarcerated and that at least two of the six sisters had criminal records." (Supreme Court of Virginia, Joint App. at 3223.) Moreover, under settled law, the Commonwealth argues that every trial attorney must be guided by the instructions of his or her client. As

the circuit court concluded, "Lovitt gave his trial counsel permission to speak with his then-girlfriend, Jane Iseton. He did not give counsel permission to speak to members of his family, and he stated to counsel that his family does not care about his situation." *Id.* Likewise, Petitioner did not disclose to his counsel information about the physical and/or sexual victimization he purportedly suffered at the hands of his stepfather.

The United States Court of Appeals for the Fourth Circuit describes this conundrum as follows, "[i]f the lawyer facing a reluctant client accedes to the client's requests, he might be constitutionally ineffective. On the other hand, if the lawyer defies his client's wishes, and in doing so presents evidence that harms the client, he might render ineffective assistance and commit malpractice as well." *Frye v. Lee,* 235 F.3d 897, 907 (4th Cir.2000).

For the purposes of a capital case, in weighing the objective reasonableness of an attorney's mitigation investigation, the United States Supreme Court has counseled that often an attorney should be guided by his client's instructions:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information .... [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 (citation omitted). *See also Barnes v.*

*Thompson,* 58 F.3d 971, 979–81 (4th Cir. 1995).

Petitioner points this Court to various cases in which an appellate court required trial counsel to undertake a reasonable investigation of potential mitigating evidence, even over the objection of their client. Specifically, he draws the Court's attention to *Frye v. Lee,* 235 F.3d 897 (4th Cir.2000); *Matthews v. Evatt,* 105 F.3d 907 (4th Cir.1997); and *Hamblin v. Warden,* 354 F.3d 482 (6th Cir.2003).

In *Frye,* the Petitioner "flatly forbade his attorneys from involving his family in investigating his background." *Frye,* 235 F.3d at 904. "Based on Frye's refusal to allow himself or his family members to participate in the development or presentation of mitigation evidence, Frye's counsel came to the reasonable conclusion that attempting to find such evidence would be fruitless." *Id.* Moreover, "defense counsel painstakingly informed Frye of the consequences of not involving family members in the mitigation stage. Frye, however, refused to accede to the warnings and advice of his lawyers." *Id.* at 905. According to the Fourth Circuit, "it is not [the court's] role to second-guess the competence of counsel in these circumstances." *Id.* at 905 (citing *Fisher v. Lee,* 215 F.3d 438, 447 (4th Cir.2000); *Eaton v. Angelone,* 139 F.3d 990, 994 (4th Cir.1998)). Regardless, the Fourth Circuit held that the ABA Guidelines require more of trial counsel. "Simply because the defendant objects to the development of evidence ... does not necessarily absolve his lawyers from gathering that evidence." *Id.* The *Matthews* and *Hamblin* cases, also cited by Petitioner, reiterate this responsibility.

In light of their client's objection to interviewing his family members, Frye's trial counsel convinced him, as a sort of compromise, to submit to a psychological examination. To that end, the examining psychologist was provided with Frye's hospital records and other relevant documents. The expert then used those documents to interview and study the defendant. Thus, instead of offering direct family testimony as mitigation evidence, counsel used the psychologist's report as a vehicle to present Frye's personal history to the jury.

■ "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. With that advice in mind, the Fourth Circuit found that Frye's trial counsel "endeavored to do their best, under difficult circumstances interposed by their client." *Frye,* 235 F.3d at 905.

In the immediate case, it may be that Petitioner's trial counsel failed to conduct a text book background investigation for purposes of Lovitt's sentencing hearing. This Court is mindful, however, that in evaluating the effectiveness of counsel's performance, the touchstone is one of reasonableness. Despite Petitioner's request that counsel limit their contact with his family, Lovitt's attorneys combed his social service and correctional records, which covered a significant portion of his life, for mitigating evidence. For the most part, what those documents revealed was information that was both potentially harmful to Petitioner and arguably supportive of the Commonwealth's argument for future dangerousness. In this Court's opinion, even if trial counsel had gathered information about the alleged sexual and physical abuse Petitioner suffered, its introduction may have opened the door to damaging cross-examination testimony. The decision of trial counsel to pursue one particular venue of investigation over another requires a strategic weighing of options, and

such decisions must be reviewed from trial counsel's perspective.

Here, given trial counsel's familiarity with Petitioner's background, particularly his criminal history and that of his siblings; counsel's examination of Lovitt's extensive social and correctional records; and Petitioner's specific instruction that counsel refrain from contacting his family, this Court finds that it would have been objectively *unreasonable* for counsel to expend more time and resources investigating Petitioner's family history. Thus, Petitioner has failed to persuade this Court that his counsel's decision not to perform additional mitigation investigation constituted anything less than sound trial strategy.

■ Turning, then, to the prejudice analysis conducted by the Supreme Court of Virginia, this Court is of the opinion that the state appellate court reasonably and appropriately applied *Strickland.* The Supreme Court of Virginia meticulously compared and contrasted the immediate case with *Wiggins* and *Williams.* By weighing the aggravating evidence in Lovitt's case against the totality of available mitigating evidence, the state appellate court properly applied *Wiggins.* Accordingly, in its final analysis, the Supreme Court of Virginia properly held that "the record fails to show that, but for his trial counsel's stated failures, there is a reasonable probability that the result of the proceedings would have been different. In short, the record before us does not undermine confidence in the outcome of the proceedings." *Lovitt II,* 266 Va. at 257, 585 S.E.2d at 825 (citations omitted).

In reviewing the Supreme Court of Virginia's conclusion that Petitioner failed to demonstrate the requisite prejudice under *Strickland v. Washington,* this Court cannot find that the Court unreasonably applied clearly established law, as determined by the United States Supreme

Court. Neither did the Court make unreasoned or unfounded findings of fact as to Petitioner's claim that his counsel provided ineffective assistance during the penalty phase of trial. Consequently, this Court cannot grant Petitioner's writ based on his ineffective assistance of counsel claim.

## XI. ADDITIONAL MISCELLANEOUS ISSUES RAISED BY PETITIONER

■ By order entered January 7, 2004, this Court restricted Petitioner to a fifty(50) page brief in support of his Petition for Writ of Habeas Corpus. On February 26, 2004, Petitioner requested leave of Court to file a brief in excess of fifty (50) pages. That request was denied. Thereafter, in footnote one, on page one of his Petition, the petitioner alleged that, due to the court-ordered page restriction, he was forced to exclude from his Petition and was unable to fully develop certain exhausted, non-frivolous, and properly preserved claims he might otherwise have raised.

On May 7, 2004, this Court ordered Petitioner to file a statement succinctly reciting all of the issues that were affected by the court-ordered page length restriction. Petitioner timely filed his Statement of Issues Excluded. A response from Respondent was neither ordered nor required, and none was filed.

As a result of the court-imposed page limitation, Petitioner argues that he was unable to fully develop five of the claims raised in his Petition, and he was completely precluded from raising four additional, properly-preserved claims. Subsequently, counsel for Petitioner was given one and one-half hours to present oral argument on *all* of the claims raised in his petition. Accordingly, this Court is of the opinion that Petitioner has had ample op-

portunity to fully develop all of the claims he advances in his habeas petition.

The page limitation imposed by this Court did not restrict the number of issues Petitioner was permitted to raise in his Petition. Rather, it limited the manner in which they were to be presented. The United States Court of Appeals for the Fourth Circuit has rejected similar arguments challenging its fifty-page limit for briefs on direct appeal. *See Weeks v. Angelone,* 176 F.3d 249, 271–72 (4th Cir.1999). As the Court noted in *Weeks,* "while the page limitation may have lead [petitioner's] counsel to make certain strategic choices as to which arguments to include and which to omit, the page limitation is reasonable." *Id.* at 272. Another judge of this Court also found a similar, fifty-page limit on state habeas petitions to be reasonable. *See Orbe v. True,* 233 F. Supp.2d 749, 763–64 (E.D.Va., 2002) (Ellis, J.), *aff'd,* 82 Fed. Appx. 802, 2003 WL 22920337 (4th Cir.2003).

Two of the issues Petitioner was purportedly unable to raise due to the page limitation concern his trial counsel's failure both to reasonably investigate whether the bloody scissors could have caused the victim's wounds and to cross-examine the Commonwealth's witnesses as to whether the bloody scissors could have caused the wounds. Here, it is undisputed that, prior to trial, Lovitt's counsel consulted with a forensic expert and learned that the bloody scissors, in fact, could have caused the victim's wounds. *Lovitt II,* 266 Va. at 246, 585 S.E.2d at 818. Trial counsel's investigation, therefore, was objectively reasonable. Moreover, given the opinion of the defense expert, counsel's determination not to cross-examine the medical examiner as to whether the bloody scissors could have caused the victim's wounds was a reasonable, strategic decision. Consequently, the Supreme Court of Virginia's rejection of these two claims emanated both from a reasonable determination of fact and a reasonable application of federal law.

Third, Petitioner contends that once trial counsel learned, on the day before trial, that Lucas would testify on behalf of the Commonwealth, their failure to request a continuance in order to investigate Lucas's background equaled ineffective assistance of counsel. This argument appears to be predicated on a false notion that the prosecution in the Commonwealth of Virginia is required to disclose the names of its witnesses prior to trial. Such is not the law in the Commonwealth. *See Watkins v. Commonwealth,* 229 Va. 469, 478–79, 331 S.E.2d 422 (1985), *cert. denied,* 475 U.S. 1099, 106 S.Ct. 1503, 89 L.Ed.2d 903 (1986). On the contrary, aside from exculpatory evidence, there is no constitutional right in a criminal case to discovery. *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Thus, had counsel requested a continuance on such shallow grounds, it is likely that the trial court would have denied that request. Accordingly, in rejecting this claim, the Supreme Court of Virginia again applied federal law reasonably.

Lastly, Petitioner would have challenged the specific methods used by the Commonwealth of Virginia to carry out execution by lethal injection. Conceding that the issue may be prematurely raised, Petitioner asserts that he would have argued that, even at this stage of the proceedings, such a claim is ripe for review. Petitioner did not include this issue in his state court petition. Moreover, there is no precedent from the United States Supreme Court, and indeed Petitioner cites none, holding that lethal injection, as a method of execution, is vulnerable to constitutional challenge. Consequently, this claim is likewise rejected.

## XII. CONCLUSION

For all the reasons stated above, this Court must grant Respondent's motion, and Lovitt's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 must be dismissed in full. Accordingly, the stay of execution entered by Order dated December 23, 2003 must be vacated.

An appropriate Order will accompany this Memorandum Opinion.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so Ordered.